529 S.E.2d 45

Gabrielle HUNDLEY, a minor under the age of fourteen (14) years, by through her Guardian ad Litem, Peggie W. HUNDLEY, Respondents,

v.

RITE AID OF SOUTH CAROLINA, INC. and Howard Jones, Appellants.

Ronald R. Hundley and Peggie W. Hundley, Respondents,

v.

Rite Aid of South Carolina, Inc. and Howard Jones, Appellants.

No. 3126.

Court of Appeals of South Carolina.

Heard Sept. 8, 1999.

Decided Feb. 28, 2000.

Rehearing Denied May 6, 2000.

---

286 

 

288

290

Charles E. Carpenter, Jr. and Elizabeth Brosnan, both of Richardson, Plowden, Carpenter & Robinson; T. Patton Adams and Hardwick Stuart, both of Berry, Adams, Quackenbush & Stuart, all of Columbia, for appellants.

James C. Anders, Thad L. Myers and Cheryl F. Perkins, all of James C. Anders, P.A.; James B. Richardson, Jr., of Svalina, Richardson & Larson, all of Columbia, for respondents.

HOWARD, Judge:

These consolidated tort actions arise from injuries sustained by Gabrielle Hundley, a minor child, after she ingested medication from an incorrectly filled prescription. A jury trial resulted in a verdict for Gabrielle Hundley (Gabrielle) against Howard Jones, the pharmacist, and Rite Aid of South Carolina (Rite Aid) (collectively "defendants") in the sum of $5,000,000 actual damages, and against Rite Aid in the sum of $10,000,000 punitive damages. The jury returned a verdict in the parents' companion case against both defendants for actual damages in the sum of $20,000, and against Rite Aid for punitive damages in the sum of $1,000,000. Both defendants appeal. We affirm.

## FACTS/PROCEDURAL BACKGROUND

### Facts Regarding the Injury

On February 20, 1995, Dr. Jan Shaw diagnosed seven-year-old Gabrielle Hundley with attention deficit hyperactivity dis-

order ("ADHD") and prescribed Ritalin. Dr. Shaw is a pediatric neurologist. Peggie Hundley, Gabrielle's mother, took the prescription to a Rite Aid pharmacy in Rock Hill, South Carolina, where it was filled that evening.

The next morning, Mrs. Hundley gave Gabrielle one tablet from the prescription bottle as directed. She then took several tablets to Gabrielle's school with appropriate instructions to give Gabrielle one tablet each day at 11:30 a.m. School officials administered a second dose at 11:30 as instructed. Unfortunately, the Rite Aid prescription did not contain Ritalin, but instead contained six milligram tablets of Glynase, an adult medication used to treat diabetes.

Shortly before 2:30 p.m., Gabrielle had a seizure. She lost consciousness and was taken by emergency service personnel to the hospital. She was in a hypoglycemic coma. She stayed in a coma for several hours and remained in the hospital overnight.

Gabrielle's doctors determined her coma was induced by her ingestion of Glynase. Glynase is a medication designed to lower blood sugar levels in adult diabetics. It is not prescribed for children at any dose, and a six milligram tablet is a high dosage, even for an adult.

According to doctors, while Gabrielle was in a hypoglycemic coma her blood sugar fell to a level at which her brain cells, particularly the gray cells of the cerebral cortex, began using their own proteins and lipids as fuel to avoid necrosis.[1] As a result, Gabrielle suffered permanent brain damage.

Experts opined at trial that Gabrielle's ability to learn has decreased since the incident, and she has not progressed academically or behaviorally at her previous rate of progress. She has fallen behind her peers despite extra help from her parents, tutors, and summer school. Evidence indicated that Gabrielle's ability to care for herself has also decreased. According to Gabrielle's parents, she can no longer manage personal hygiene without assistance. She cannot fully dress herself, and she is unable to manage clothing fasteners. She makes poor choices, endangering herself further.

---

1. Necrosis is the pathologic death of living tissue. *See Taber's Cyclopedic Medical Dictionary* 1280 (17th illus. Ed.1993).

In addition to her brain injury, Gabrielle was described as suffering mental trauma, including major depression, post traumatic stress disorder, and separation anxiety disorder. At trial, Gabrielle was categorized for the first time as mentally retarded because of her brain injury.

The two actions were tried together beginning on October 7, 1996. During trial, the Hundleys' economist, Dr. Oliver Wood, was allowed to base his opinions as to the present value of future damages upon cost estimates contained in a Life Care Plan which was not admitted into evidence. The Plan included a $4,727,641 cost for institutionalized care for Gabrielle beginning at age twenty-one.

After the verdicts were rendered, Jones and Rite Aid made post trial motions for a new trial, new trial nisi remittitur, judgment notwithstanding the verdict, and for a review and reduction of the punitive damage award pursuant to *Gamble v. Stevenson.*[2] Testimony was taken as to the financial status of Rite Aid of South Carolina in connection with this review. This appeal is taken from a denial of all post trial motions.

Seeking clarity, we set forth the remaining facts necessary for our decision in connection with our discussion of the issues to which they pertain.

## ISSUES

I. Did the trial court abuse its discretion in allowing expert opinion testimony under Rule 703, SCRE, as to the present value of future damages based upon hearsay evidence of cost?

II. Did the trial court abuse its discretion in denying a continuance to the defendants?

III. Does the inclusion of the $4,727,641 cost for managed care require reversal of the actual damage award?

IV. Should the award of punitive damages against Rite Aid be reversed because there is no clear and convincing evidence of gross negligence in the mis-filling of Gabrielle's prescription?

V. Is the verdict as to punitive damages inconsistent?

---

2. *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991).

VI. Is the punitive damage award so excessive as to constitute a violation of due process?

## LAW/ANALYSIS

### I. RULE 703 TESTIMONY

The first issue raised by Jones and Rite Aid is that the trial court erred in allowing the Hundleys' economist, Dr. Wood, to include the $4,727,641 cost associated with future managed care in his computations and ultimate opinion. This figure was included in a Life Care Plan provided to Dr. Wood prior to trial. Although the plan was prepared by a nurse with a master's degree, certified as a rehabilitation care specialist, it was not admitted at trial and the nurse who prepared it did not testify.

Jones and Rite Aid assert that Rule 703 of the South Carolina Rules of Evidence does not permit the admission of this testimony. We disagree.

The admissibility of an expert's testimony is within the trial judge's sound discretion, whose decision will not be reversed absent an abuse of discretion. *Payton v. Kearse,* 329 S.C. 51, 495 S.E.2d 205 (1998).

Rule 703, SCRE, reads as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The defendants argue the trial court erred by allowing the expert, under the guise of Rule 703, to act as a "conduit" for inadmissible hearsay. They contend the figures were not the type of data relied upon by economists, but were instead foundational facts which must be separately proved. In this regard, they reason that Rule 703 is subservient to other Rules of Evidence.

Disposing of this latter assertion first, we note that generally under Rule 602, SCRE, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a

finding that the witness has personal knowledge of the matter." However, this rule specifically states that it is subject to Rule 703. Consequently, we do not find Rule 703 to be subservient, as argued by the defendants.

■ An expert witness may state an opinion based on facts not within his firsthand knowledge. *State v. Hutto,* 325 S.C. 221, 481 S.E.2d 432 (1997); *Ellis v. Oliver,* 323 S.C. 121, 473 S.E.2d 793 (1996); *State v. Franklin,* 318 S.C. 47, 456 S.E.2d 357 (1995); *Creed v. City of Columbia,* 310 S.C. 342, 426 S.E.2d 785 (1993); *James v. Lister,* 331 S.C. 277, 500 S.E.2d 198 (Ct.App.1998), *cert. denied,* March 5, 1999; *Halbersberg v. Berry,* 302 S.C. 97, 394 S.E.2d 7 (Ct.App.1990); *Harris v. Campbell,* 293 S.C. 85, 358 S.E.2d 719 (Ct.App.1987). He may base his opinion on information, whether or not admissible, made available to him before the hearing if the information is of the type reasonably relied upon in the field to make opinions. *Halbersberg,* 302 S.C. at 97, 394 S.E.2d at 7; *see* J. Dreher, *A Guide to Evidence Law in South Carolina* 20 (Thames Rev.1979). Also, an expert may testify as to matters of hearsay for the purpose of showing what information he relied on in giving his opinion of value. *Halbersberg,* 302 S.C. at 97, 394 S.E.2d at 7 (citing *United States v. 5139.5 Acres of Land in Aiken and Barnwell Counties,* 200 F.2d 659 (4th Cir.1952)). The admissibility of the testimony of an expert on a fact in issue is largely within the discretion of the trial court. *Id.,* at 97, 394 S.E.2d at 7 (citing *South Carolina Dept. of Soc. Servs. v. Bacot,* 280 S.C. 485, 313 S.E.2d 45 (Ct.App.1984)).

■ Dr. Wood rendered his opinion as to the economic damages sustained by the Hundleys, which included the present value of future medical and related costs. To render his opinion, he relied upon cost information contained in the Life Care Plan. As to the costs associated with future care, he testified that he could have obtained the figures himself, but the information contained in the plan was of the type normally relied upon by experts in his field in rendering an opinion. Based upon this foundation, the trial court allowed the testimony. We see no abuse of discretion.

In this case, the contested cost components were not opinions of others. The information was easily ascertainable, and would have been no less hearsay had the economist made the

inquiry from the health care providers himself. Indeed, we see no distinction between this information and the other information necessary to a present day value calculation, such as inflation rates, wage rate tables, and life expectancy tables.

We find support for this conclusion in our case law and in the case law from other jurisdictions interpreting Rule 703. In *Creed*, the appellant objected to a psychiatrist's opinion testimony on the grounds that, in rendering his opinion, the psychiatrist relied on tests and a report completed by a non-testifying neuropsychologist. *Creed*, 310 S.C. 342, 426 S.E.2d 785 (1993). The court pointed out that Rule 43(m)(2), SCRCP,[3] which is identical to the Federal Rule 703, allows experts to give opinions based on facts or data which would otherwise not be admissible, provided the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences in the subject area. Ruling the evidence was properly admitted, the court stated, "[t]he reasoning behind this rule is that physicians make life and death decisions in reliance upon information from numerous sources, including opinions and reports from other doctors. The testifying physician's validation, expertly performed and subject to cross examination, ought to suffice for judicial purposes." *Id.*, at 345, 426 S.E.2d at 787 (citing Advisory Committee's Notes for Fed.R.Evid. 703).

In *Franklin*, our supreme court upheld the admission of an expert's testimony based on facts or data not otherwise admissible, quoting the Indiana decision *Henson v. State*, 535 N.E.2d 1189 (Ind.1989) with approval on this point: " '[A]n expert's specific knowledge is neither determinative of his qualifications as an expert nor of the admissibility of his opinion into evidence, but bears on the weight to be given his testimony.' " *Franklin*, 318 S.C. at 58, 456 S.E.2d at 363 (quoting *Henson*, 535 N.E.2d at 1193); *see also Ellis*, 323 S.C. at 121, 473 S.E.2d at 793 (there was nothing improper in allowing respondent's experts to give opinions based in part on the statements in medical records).

Finally, in *Hutto*, our supreme court concluded that an expert's opinion testimony comparing a footprint found at the scene of the crime to that of the shoe belonging to the

3. Rule 43(m)(2) is identical to our current Rule 703.

defendant, based in part upon a non-testifying expert's report which was not introduced into evidence and in part upon the non-testifying witness's work raising the latent shoe print on a business card found at the scene, was properly admitted under a Rule 703 analysis. The court noted that the expert was not relying on any subjective opinion of the non-testifying expert; the expert's opinion regarding whether a match existed was totally his own. *Hutto*, 325 S.C. 221, 481 S.E.2d 432 (1997).

Applying Rule 703, the court reasoned that "this evidence falls within a firmly-rooted hearsay exception and thus reliability can be inferred." *Id.*, at 229, 481 S.E.2d at 436 (citation omitted). Quoting the Fifth Circuit Court of Appeals, the court stated, " '[e]xpert witness testimony is a widely-recognized exception to the rule against hearsay testimony.' " *Id.* (quoting *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir.1971) (en banc) (1972)).

> The rationale for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion. Moreover, the opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data, but from education and from a lifetime of experience. *Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.*
> *Williams*, 447 F.2d at 1290 (emphasis added).

Other jurisdictions interpret Rule 703 in the same way. In *Walters v. Yellow Cab Co.*, 273 Ill.App.3d 729, 210 Ill.Dec. 590, 653 N.E.2d 785 (1995), the Illinois Appellate Court held there was no abuse of discretion in the admission of future medical cost estimates by the plaintiff's testifying doctor, even though the costs were provided to him by his nurse and were based on inquiries to other doctors at his medical facility, finding the situation was contemplated by Rule 703.

In *St. Paul Med. Ctr. v. Cecil*, 842 S.W.2d 808 (Tex.App. 1992), an expert testified to future damages based upon tuition

costs obtained from schools. The court ruled that under Rule 703 the expert could properly base his opinions concerning those costs on the hearsay data, noting the expert testified that he and other experts rely on costs obtained from schools to prepare treatment plans. Consequently, the testimony was admissible under Rule 703.

In *Steinhauer v. Wilson,* 336 Pa.Super. 155, 485 A.2d 477 (1984), the court ruled that testimony of an expert in construction was properly admitted even though the expert based his opinion on cost figures provided to him by various contractors with whom he had consulted, finding it proper under Rule 703. Likewise, in *Dixon v. Ledbetter,* 262 Ark. 758, 561 S.W.2d 294 (1978), the court found the testimony of the expert, relaying figures given to him by a non-testifying subcontractor, was properly admitted under Rule 703 where the expert relied upon those figures to calculate the overall cost of repair. In so ruling, the court noted:

> The test stated in the rule is whether the expert's reliance is reasonable. It was not prima facie unreasonable for the expert witness in this case to ascertain the cost of the required pieces of sheet metal by consulting a supplier.... [T]he same cost figure could have been shown by calling the supplier as a witness. That cumbersome procedure is now readily avoidable; for the expert witness can be cross-examined about his expertise in the matter and about the reasonableness of the supplier's estimate.

*Id.* at 296.

In each of these cases, information was provided to the expert and formed a part of the basis for the expert's opinion. The information was of a type relied upon by experts in their respective fields, and that reliance was reasonable. In this case, Dr. Wood testified that the cost figures contained in the Life Care Plan were the type of information relied upon by experts in the field of economics, and the court determined that reliance to be reasonable. As to the medical necessity of the future care, there was ample testimony from other witnesses to substantiate the basis for including these elements of damage. Dr. Tidler, a board certified child, adolescent and forensic psychiatrist, testified at length to Gabrielle's need for each of the items included in the economist's computations.

Based upon the above analysis, we find no abuse of discretion by the trial court in the admission of the economist's opinion.

In reaching this conclusion, we disagree with the defendants' assertion that Dr. Wood was a "mere conduit" to introduce evidence which had already been ruled inadmissible as hearsay. The defendants cite *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir.1993); *United States v. Tomasian*, 784 F.2d 782 (7th Cir.1986); *Sims v. Safeway Trails, Inc.*, 297 Ark. 588, 764 S.W.2d 427 (1989); and *Faulkner v. Markkay of Indiana, Inc.*, 663 N.E.2d 798 (Ind.App. 1996) as authority for this position. However, we find these cases readily distinguishable, because in each of these cases the expert attempted to testify to hearsay which did not form a part of the basis for a valid opinion.

In *TK-7 Corp.*, one expert testified to the opinions of another expert as to potential future lost profits of the plaintiff in a foreign oil market, without objection. However, the Court of Appeals held that this testimony could not be considered as substantive evidence of damages under a Rule 703 analysis because the testifying expert had no expertise in assessing damages in a foreign market, and by assuming the sales projections made by the non-testifying expert, he "in essence assumed the very matter at issue on which he was called to express his opinion." *TK-7 Corp.*, 993 F.2d at 732.

Likewise, in *Tomasian*, the Court of Appeals affirmed the trial court's exclusion of testimony by the defendant's expert as to value because he had no opinion of his own, but could merely relay another expert's opinion. As the court stated, "Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay." *Tomasian*, 784 F.2d at 786.

In *Sims*, the appellate court affirmed the trial court's exclusion of an expert's testimony relaying what his investigator had told him concerning the condition of a vehicle's brakes as hearsay. The court noted that normally the inquiry into the admissibility of this type of evidence would not stop at the conclusion that the proposed testimony is hearsay because Rule 703 allows an expert to rely on facts not admissible in evidence, but in the case at bar no further inquiry was necessary because the data was not relevant to any opinion

expressed by the expert in explaining how the mishap occurred. "[The expert] did not purport to have an opinion as to how the collision occurred which was even remotely related to the condition of the bus's brakes." *Sims,* 764 S.W.2d at 429.

Finally, in *Faulkner,* the plaintiff appealed the lower court's refusal to allow the introduction of the opinions of non-testifying surgeons through the testimony of a testifying chiropractic doctor. The appellate court affirmed because the chiropractic expert did not have the training or education in medicine to base an opinion on this hearsay, and the chiropractor's testimony would have been merely a recitation of the opinion of others.

In each of these cases the evidence was excluded because it did not meet the criteria set forth under Rule 703. It was not information upon which an expert in the field would reasonably rely in reaching an opinion and/or did not form the basis of the expert's own opinion. Here, the evidence does meet the criteria set forth under Rule 703. Consequently, we find no abuse of discretion in the trial court's ruling.

## II. DENIED CONTINUANCE REQUESTS

Jones and Rite Aid next argue the trial court abused its discretion in refusing their October 2 and October 4 requests for a continuance. They argue that the late completion and discovery of the Life Care Plan and the late change of Gabrielle's diagnosis by Dr. Venn, from not mentally retarded to mentally retarded, improperly compromised their defense.

The pretrial proceedings, particularly the course of discovery, provide important information which is integral to the trial court's rulings and to this Court's disposition of this issue. For that reason, we review them here.

On March 23, 1995, the Hundleys filed an action on Gabrielle's behalf and another on their own behalf, naming Jones and Rite Aid as defendants in both suits. The complaints alleged, among other things, that Gabrielle's damages included pain and suffering, emotional trauma, and permanent physical and emotional injury. Jones and Rite Aid filed answers including a denial of negligence and an assertion of comparative negligence of Mrs. Hundley both as a bar to recovery,

and, in the alternative, as a basis for reduction of any damage award.

In June of 1996, the Hundleys amended the complaints to allege the negligence of Rite Aid in the hiring, retention, and supervision of Jones as a proximate cause of Gabrielle's injury. Again, Jones and Rite Aid filed answers denying the material allegations and asserting the same affirmative defenses.

The defendants filed and served the Hundleys with "Standard Interrogatories" allowed under Rule 33(b), SCRCP. These interrogatories are limited in scope, and are intended to provide basic discovery in all cases while not being overly burdensome to the parties. Thus, as pertinent to the issues here, they placed upon the Hundleys a continuing obligation up to the time of trial to:

(3) set forth names/addresses of all treating physicians, and all hospitals to which the party has been committed, together with all medical costs involved; (5) set forth an itemized statement of damages claimed to have been sustained, not including pain and suffering; (6) set forth the names/addresses of experts proposed as witnesses; and (7) as to each person known to be a witness concerning the facts, set forth a summary sufficient to inform the other party of the important facts known to or observed by such witness, or provide a copy of any written or recorded statements taken from such witnesses.

Rule 33, SCRCP. Although Rule 33 allows up to 50 additional interrogatories to each party where the amount in controversy is not less than $25,000, no further interrogatories were served upon the Hundleys.

The Hundleys filed a Rule 36, SCRCP Request To Admit upon Jones and Rite Aid early in the litigation, according to the discovery order of Judge Hayes dated September 23, 1996, requesting that they admit the prescription had been misfilled. Jones and Rite Aid declined to make that admission. Thus began the Hundleys' quest to uncover evidence concerning the filling of the prescription.

According to the un-appealed final order of Judge Hayes compelling discovery, the Hundleys first served interrogatories and requests for production upon Jones and Rite Aid on July 14, 1995. These interrogatories went unanswered, and

3½ months later the Hundleys filed a motion to compel. On the eve of the hearing, the defendants agreed to comply with discovery and to consent to an order compelling compliance, so the hearing was canceled. Notwithstanding the agreement, the defendants did not sign the consent order or comply with discovery.

On January 17 and February 8, 1996, partial answers to interrogatories were provided by the defendants. On April 22, 1996, the Hundleys filed another motion to compel responses to the first interrogatories and requests for production, as well as to compel responses to the second set of interrogatories which had been served on February 2, 1996. By the time of the hearing on the motion scheduled for April 30, 1996, the defendants were also overdue in their responses to a third set of discovery requests. The court ordered defendants' full compliance by May 15, 1996, or suffer the ultimate sanction of striking the answer and entering a default judgment.

The defendants provided their next written responses to discovery on May 14 and 15, 1996, and they are most notable because the defendants represented that computer data and other pharmaceutical records required to be kept by law could not be located or retrieved. See S.C.Code Regs. 99–27 (Supp. 1999). They further represented that no 6 milligram Glynase tablets had been dispensed by the Rock Hill pharmacy in question (store 1124) during the three month time period surrounding this incident.

On July 9, Judge Hayes again ordered the defendants to produce the original slips regarding prescriptions filled by Rite Aid during the time in question by 5:00 P.M. on August 16, 1996, or suffer the consequence of striking the defendants' answer. In the same July 9 order compelling discovery, the court required Rite Aid to once more answer the interrogatories regarding the dispensing of Glynase and the unavailability of computer records documenting the prescription activities at the store. This time the court required that the answers be certified by a senior Rite Aid corporate officer.

The missing computer records were then located by Rite Aid. Contrary to their prior sworn answers, these records established that Glynase had indeed been sold at the Rock Hill

store during the same time period as the Ritalin prescription for Gabrielle. The Glynase prescription was for the exact dosage and number of tablets which Mrs. Hundley reported receiving as Ritalin. The prescription slips were also produced, but the two most relevant records were mysteriously missing—the Hundley Ritalin prescription and the 80 tablet, 6 milligram, Glynase prescription. Unlike the computer records, the prescription slips could not be altered. These revelations were divulged after the next motion to compel, on August 15, 1996, less than two months before trial.

During this same time period, the Hundleys noticed the depositions of five Rite Aid employees for July 10 and 11, 1996, and Rite Aid's named treasurer and South Carolina registrant for service of process for July 17, 1996. On July 9, Rite Aid requested postponement of the depositions. By agreement, they were postponed until July 23 and 26, 1996. However, after the time for commencement of the depositions on July 23, Rite Aid first notified the Hundleys that *no* witnesses would be produced, and several were no longer employed by Rite Aid and had not been so employed since the summer of 1995. The Hundleys were informed that Rite Aid's treasurer and registrant refused to travel from Pennsylvania to South Carolina for the taking of his scheduled deposition, even though no timely objection had been interposed.

Again, the Hundleys filed a motion to compel which was heard on August 15, 1996. The court concluded that any objection to the place of deposition had been waived, and furthermore, that the treasurer and registrant was a managing agent subject to deposition in South Carolina.

The discovery abuse was not finished. The Hundleys sought records of the relationship between Rite Aid of South Carolina, Inc. and Rite Aid Corporation (the parent corporation), in order to analyze whether the two were separate corporate entities and to understand their financial interrelationship, surmising it might relate to the ability of Rite Aid of South Carolina to respond to punitive damages. There has been no appeal of the order compelling this discovery, yet even by the time of trial, during trial, and post trial, Rite Aid has refused without explanation to produce the requested documents. As a result, the trial court charged the jury that

if they determined the Hundleys had proved a right to punitive damages against Rite Aid, they need not consider Rite Aid's ability to pay punitive damages, because as a matter of law, Rite Aid could afford to pay them. There was no contemporaneous objection to this charge, and there is no appeal from it.

In the last pretrial order related to the Hundleys' motions to compel discovery, dated less than a month before trial, the court ordered Rite Aid to pay the Hundleys' expenses caused by Rite Aid's conduct and a $10,000 fine to the court. After outlining Rite Aid's various discovery abuses, the court stated:

> The above litany of the conduct of Defendant throughout this litigation reveals a clear pattern of abusive and obstructionist behavior.[4] It is obvious to this Court that a great deal of Plaintiffs' discovery and preparation in this case has been aimed toward establishing the fact of the mis-fill and the manner in which it occurred. Plaintiff early on in the li[ti]gation requested that Defendant admit that the mis-fill had occurred, and pursuant to Rule 36 of the South Carolina Rules of Civil Procedure Defendant declined to make that admission of fact. Now, over a period of more than a year since this case was filed, documents and materials which have been exclusively in the possession, custody and control of Defendant are surfacing which appear to make it highly likely that the claimed mis-fill did occur and give some indication as to how it occurred. Rather than come forward with all such information and evidence in the ordinary course of discovery, Defendant took the path of concealment and obstructed Plaintiffs' attempts to ascertain the truth.
>
> On the basis of the forgoing, I find that some of Defendant Rite Aid of South Carolina's conduct in this matter was intentional and in bad faith, that such conduct has accounted for expanding the scope of this action into a complex and laboriously pursued discovery contest with a commensurate unnecessary expenditure of court time and immeasurable diversion of resources, in terms of time and expense by Plaintiffs' counsel.

---

4. In the trial court's footnote, it stated its belief, which we share, that Rite Aid's trial counsel acted in good faith and used his best efforts to comply with discovery.

In total, the circuit court assessed more than $40,000 in sanctions against Rite Aid in fines, attorneys' fees, and costs for discovery abuses. Rite Aid has not appealed any of the discovery sanctions.

Although the defendants were not complying with discovery requests, they consented to a scheduling order delineating a discovery schedule which culminated in a date-certain trial set for October 7, 1996. The scheduling order was entered by Judge Hayes on August 6, 1996. The scheduling order required the taking of all expert depositions by September 6, 1996.

It is against this backdrop that the defendants seek reversal, based upon surprise at the extent of damage claimed by the Hundleys at trial.

■■■■ A judge's ruling on whether to grant a continuance will not be disturbed absent an abuse of discretion. *Reiland v. Southland Equip. Serv., Inc.,* 330 S.C. 617, 500 S.E.2d 145 (Ct.App.1998). To justify a continuance, the moving party must show not only the absence of some material evidence, but also due diligence on his part to obtain it. *Id.,* at 617, 500 S.E.2d at 145; *Hudson v. Blanton,* 282 S.C. 70, 316 S.E.2d 432 (Ct.App.1984).

The parties were granted a day-certain trial, which gave them priority status over other cases pending on the court's docket. The administrative judge granted this request in deference to the complexity of the case. Our state has long recognized that "[t]he authority of the court to grant continuances and to determine the order in which cases shall be heard is derived from its power to hear and decide cases. This adjudicative power of the court carries with it the inherent power to control the order of its business to safeguard the rights of litigants." *Williams v. Bordon's, Inc.,* 274 S.C. 275, 279, 262 S.E.2d 881, 883 (1980).

The court bears a great responsibility when signing a scheduling order which grants this special request, because it directly impacts upon the rights of other litigants. When we review the denial of a continuance in the exercise of the court's discretion under these circumstances, we are mindful of the responsibility which the parties and their counsel assume by seeking and receiving a day-certain status. It is incumbent

upon them to lay aside other business, and give priority in their preparation to that which they have asked the court to prioritize.

It would not be proper for a court to deny a continuance as a sanction for unrelated discovery abuse. *Griffin Grading and Clearing, Inc. v. Tire Serv. Equip. Mfg. Co., Inc.*, 334 S.C. 193, 511 S.E.2d 716 (Ct.App.1999) (sanction should be aimed at the specific conduct of the party sanctioned and not go beyond the necessities of the situation to foreclose a decision on the merits of a case). Nevertheless, in ruling upon a motion for continuance, the court must determine the merits of the moving party's argument, which entails an evaluation of credibility. Certainly a documented history within the case of discovery delay and abuse by a party may be properly considered when evaluating the credibility of that party's claim of surprise and prejudice.

The defendants first claim error in the failure to grant a continuance based upon the change in diagnosed condition of Gabrielle to mental retardation just before trial. As the Hundleys point out, the record does not reflect that Jones and Rite Aid requested a continuance after this change in Gabrielle's diagnosis. An argument is not preserved for review where it has not been raised to or ruled upon by the trial court. *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 506 S.E.2d 497 (1998) (issues not raised to and ruled on by the trial court are not preserved for appellate review).

Jones and Rite Aid moved for a continuance during pretrial conferences conducted in chambers outside the presence of a court reporter. Normally, motions must be made on the record to be preserved. *York v. Conway Ford, Inc.*, 325 S.C. 170, 480 S.E.2d 726 (1997); *see also* Rule 7(b)(1), SCRCP. However, an oral motion that is later reduced to writing can preserve an issue for appeal. *Cockfield v. Jeffcoat*, 280 S.C. 606, 313 S.E.2d 365 (Ct.App.1984). At the trial judge's suggestion, Jones and Rite Aid's counsel attempted to reduce the oral, pretrial motions to writing in an affidavit completed after trial. The affidavit states the trial judge denied the motions for continuance, but fails to explain his reasoning. The absence of the trial court's reasoning makes our task difficult. As appellants, Jones and Rite Aid bear the

burden of providing the court with a record sufficient to allow appellate review. *Medlock v. One 1985 Jeep Cherokee,* 322 S.C. 127, 470 S.E.2d 373 (1996). Nevertheless, we conclude the trial judge did not abuse his discretion in refusing either the October 2, or the October 4 request for a continuance.

 The defendants place great emphasis on the change in diagnosis to "mental retardation." We conclude the record does not support a basis for attaching such significance to this change in label. The defendants took the deposition of Dr. Tidler, a neuro-psychiatrist with experience evaluating children, on September 13, 1996. Dr. Tidler evaluated Gabrielle, noting she had a borderline level of intellectual functioning, with a "full scale I.Q." of 69. Her assessment was based, in part, on the test results of a clinical psychologist, Dr. Venn, who had concluded Gabrielle's level of functioning was "slightly above mental retardation."

In the deposition, Dr. Tidler recommended Gabrielle receive "ongoing assistance in almost every facet of her daily life." She opined:

Gabrielle's deficits are comprehensive and interfere in many different aspects of daily living and learning and processing information, and it's such a global comprehensive problem that she will require an individual to assist her, for example, with a checking account, managing her finances. She will require an individual to monitor her in many ways almost as a child, in that her deficits are of the nature that she has difficulty learning, processing information, that as that goes on in life that results in poor judgment and poor decisions, and when individuals are impaired in that manner they either have somebody who is by their side assisting them in those different facets, in those different areas of life, or they make impulsive decisions, place themselves in dangerous situations, end up having a very chaotic, disorganized, self-destructive outcome.

Gabrielle's future needs described at trial were consistent with those described by Dr. Tidler in her deposition, and Gabrielle's I.Q. of 69 had already been described as the borderline level for mental retardation. Therefore, we see no abuse of discretion in the trial court's refusal of the continuance on this basis.

The defendants next argue a continuance was mandated by the late revelation of the Life Care Plan. Jones and Rite Aid received a copy of the Life Care Plan on October 1, six days before trial. Although the defendants describe the $4,727,641 cost figure contained in the Life Care Plan as a total surprise, the pretrial discovery and pleadings prove otherwise.

First, we note that from the time of the very first Complaint the Hundleys claimed that Gabrielle had sustained permanent physical and mental damage. More than six months before trial, Dr. Venn opined that she had suffered brain damage lowering her I.Q. to 69, which was borderline for mental retardation. Dr. Tidler's deposition testimony, quoted above, was certainly sufficient to alert the defendants that Gabrielle would require a significant level of care in the future.

While they may not have expected its total, they had been informed on at least two prior occasions that the sum which was anticipated for future care would be substantial. In a supplemental answer to defense interrogatories, on August 26, 1996, the Hundleys stated that Dr. Wood was still working on preparing a total cost "to provide the care [Gabrielle] will need in the future, but a very substantial figure is anticipated." The Hundleys also proposed a settlement on August 29, 1996 based on Dr. Wood's opinion that they should not settle for less than $5,000,000.

Although the defendants complain about the last minute insertion of the $4,727,641 cost figure, they have presented no argument to the trial court and there is no evidence in the record which explains why this cost is so difficult to verify, and why they could not reasonably have prepared to defend against it in the last six days before trial. In reality, what the defendants argue as prejudicial is the medical basis for this cost; that is, Gabrielle's need for managed care. But this prejudice, the trial court found, was of their own making. Under the circumstances of this case, we see no abuse of discretion in this ruling.

As to the cost, the defendants present no evidence the figure is incorrect, or that granting a continuance would have allowed them to better defend against this estimate. As to the basis for asserting this cost as an element of damage, the

record amply demonstrates that any surprise on the part of the defendants is of their own making, and not as a result of the failure by the Hundleys to timely supplement their interrogatory answers. *See State v. Register*, 323 S.C. 471, 476 S.E.2d 153 (1996) (where parties knew in September that case was set for trial in January and full discovery had been afforded from September forward, the fact that defendant's counsel waited until the middle of December to investigate the evidence did not warrant a continuance and no abuse of discretion in the trial judge's denial of the motion for a continuance was found); *McKissick v. J.F. Cleckley & Co.*, 325 S.C. 327, 479 S.E.2d 67 (Ct.App.1996) (where plaintiff informed defendant of significant change in medical condition, court did not abuse its discretion by denying defendant's motion for continuance three weeks before trial, even though case was very complex and difficult); *Grant v. Grant*, 288 S.C. 86, 340 S.E.2d 791 (Ct.App.1986) (trial judge did not abuse his discretion in denying request for a continuance where new counsel conceded case file was fairly well prepared, he sought a continuance primarily to interview witnesses, and there was nothing in the record to explain why witnesses were not interviewed or could not have been interviewed during the six day period following the commencement of his employment).

■ The defendants next argue that they were entitled to a 120 day continuance because the parent corporation was temporarily joined as a party. On August 28, 1996, the Hundleys amended the complaints seeking to join the parent Rite Aid Corporation as a defendant. The Hundleys sought to establish that Rite Aid of South Carolina was part of the same corporation as the parent corporation, citing pharmaceutical forms, employee understanding, and overlapping corporate officers as their basis. The parent corporation appeared, and on September 19, 1996, asked for a 120 day continuance to allow for discovery as a newly added party in accordance with Rule 40, SCRCP. The Hundleys opposed the continuance, asserting that if the court refused to consider the parent corporation and Rite Aid of South Carolina as one and the same entity, then the Hundleys would voluntarily dismiss the parent corporation to avoid a continuance of the October 7 trial date. The court ruled that it would recognize the corporate distinction between the two entities, whereupon the

Hundleys were immediately granted a voluntary dismissal of the parent corporation as a defendant.

Rule 40(b), SCRCP, entitles parties to 120 additional days of discovery when a new party is added. Here, the new party was immediately dismissed as soon as they were deemed to be a new party. There was no change in the status of the litigation, either as to parties or as to issues. Consequently, this argument is without merit.

■ Finally, the defendants argue that the trial court abused its discretion by not granting a continuance based upon the death of Jones's mother prior to trial. The court took all reasonable measures to accommodate Jones's loss, short of a continuance, including offering to instruct the jury as to the reasons for his absence if he was required to leave in order to attend the funeral.[5] Jones's testimony appears normal and consistent with that contained in his deposition. The record does not reflect any difficulty in his testimony. There was no proffer for the record of any contemporaneous portrayal of Jones as unable to comprehend questions, or as being so grief stricken as to be materially impaired in his ability to testify. Consequently, there is no showing of prejudice, and we see no abuse of discretion in refusing to grant a continuance on this basis. *See Crouch v. Cudd,* 158 S.C. 1, 155 S.E. 136 (1930) (where counsel's mother fell ill, lower court did not abuse its discretion in denying continuance, especially since no prejudice was shown where all counsel were present and participated in the trial).

### III. ACTUAL DAMAGES

Jones and Rite Aid next challenge the actual damages awarded against them based upon their earlier argument that the trial court abused its discretion in admitting the cost of future medical care contained in the Life Care Plan through Dr. Wood's testimony. As we find no abuse of discretion in the admission of Dr. Wood's testimony, we find this issue to be without merit. *See Hutto,* 325 S.C. 221, 481 S.E.2d 432 (1997)

---

**5.** The funeral was on the Sunday before trial, and Jones was present on Monday. He was not called upon to testify until Thursday.

(expert's opinion is regarded as evidence in its own right and not as hearsay in disguise).

## IV. PUNITIVE DAMAGES

Next, Jones and Rite Aid argue that because there is no clear and convincing evidence of gross negligence in the mis-filling of Gabrielle's prescription, the punitive damages against Rite Aid should be reversed. We disagree.

 The power to assess punitive damages is within the discretion of the jury, as reviewed by the trial judge. *Miller v. City of West Columbia*, 322 S.C. 224, 471 S.E.2d 683 (1996). "In order to receive an award of punitive damages, the plaintiff has the burden of proving by clear and convincing evidence the defendant's misconduct was willful; wanton, or in reckless disregard of the plaintiff's rights." *Lister v. Nations-Bank, of Delaware, N.A.*, 329 S.C. 133, 150, 494 S.E.2d 449, 458 (Ct.App.1997).

 We need not determine whether the jury was pre-sented with sufficient evidence of gross negligence in the mis-filling of Gabrielle's prescription, because the jury may have awarded punitive damages against Rite Aid solely on the negligent retention and supervision claims, a possibility Rite Aid does not address in this issue. "When a jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the appellate court will affirm unless the appellant appeals all causes of action." *Creach v. Sara Lee Corp.*, 331 S.C. 461, 464, 502 S.E.2d 923, 924 (Ct.App.1998). By not arguing that the claims of negli-gent retention and supervision could not support the punitive damages awards, Rite Aid has waived that issue. *See State v. Sullivan*, 277 S.C. 35, 282 S.E.2d 838 (1981) (issue not argued in the brief is deemed abandoned and consideration on appeal is precluded).[6]

---

6. The possibility that the punitive damages were awarded on the negligent retention and supervision claim is nevertheless discussed below as it relates to Rite Aid's claim of an inconsistency in the jury's verdict.

## V. INCONSISTENT VERDICT

■ Next, Jones and Rite Aid argue that the award of $11,000,000 against Rite Aid with no punitive damage award against Jones constitutes an inconsistent verdict.[7] We disagree.

■ A jury's verdict should be upheld when possible to ascertain and give effect to the jury's intent. *Vinson v. Jackson*, 327 S.C. 290, 491 S.E.2d 249 (1997). However, a verdict which is internally inconsistent will be reversed and a new trial will be ordered. *Id.; Johnson v. Parker*, 279 S.C. 132, 303 S.E.2d 95 (1983).

Initially, we note the preservation of this issue is questionable. Rite Aid did not base any of its post trial motions on an inconsistency in the jury verdict. An issue is not preserved for appellate review unless it is raised to and ruled upon by the trial court. *Holtzscheiter*, 332 S.C. 502, 506 S.E.2d 497 (1998).

Rite Aid argues that because the jury apparently did not find Jones guilty of willful, wanton, or reckless conduct, that level of conduct may not be imputed against Rite Aid by *respondeat superior* or by way of the supervision and retention claim. They cite two cases to support this contention. In the slander action of *Kirby v. Gulf Refining Co.*, 173 S.C. 224, 175 S.E. 535 (1934), our supreme court held a master cannot be held solely responsible for damages where its liability is based on conduct of its servant alone. However, it noted that where a master's liability is based on its own conduct or the conduct of another, non-defendant servant, a verdict against the master alone is not inconsistent. *Id.* In *Collins v. Johnson*, 245 S.C. 215, 139 S.E.2d 915 (1965), the court states that where the servant has been exonerated of willfulness, the master cannot alone be held responsible for punitive damages

---

7. In their brief, Jones and Rite Aid state that the award of no damages against Jones is inconsistent with the $16,000,000 award against Rite Aid. (The argument, however, refers only to punitive damages.) They further claim that it is unclear whether the jury assessed actual damages against both Jones and Rite Aid or against Rite Aid alone. Upon review, we believe it clear that the award of actual damages is against both Jones and Rite Aid. No issue regarding the verdict form is raised by the parties.

in an action where its liability is founded solely on *respondeat superior.*

These cases do not support Rite Aid's position. Again we note that the jury may have awarded the punitive damages on the negligent retention and supervision cause of action, which was only lodged against Rite Aid.

The Hundleys presented evidence that at the time of the mis-fill, Jones was nearing the end of one of his twelve hour work shifts. Jones was sixty-five years old, and his wife had died less than one month before the mis-filled prescription. He worked these shifts five days per week without another pharmacist present to relieve him. Rite Aid permitted him to work these shifts despite his age and personal trauma, and despite the fact that he had a history of mis-filling prescriptions, did not keep his paperwork up to date, and had been cited for failing to keep the pharmacy up to DHEC regulations. A memo in his personnel file recounted that his supervisor once took fourteen hours to clean up the pharmacy and found violations such as multiple bottles of the same drug open and pill bottles on the counters without their caps.

Taken in a light most favorable to the Hundleys, the evidence also reflects that Rite Aid has no policies or procedures designed to ensure the competence of its pharmacists. Rite Aid considers its pharmacists fit to work as long as they maintain their state licenses. Rite Aid also has no policies, procedures, manuals, or directives dealing with the storage or handling of medications or the filling and labeling of prescriptions, leaving all such matters to the judgment of its pharmacists.

Considering the evidence of Rite Aid's conduct in retaining and supervising Jones, we conclude the trial court properly submitted the issue of punitive damages to the jury, and there is ample evidence from which the jury could have concluded that Rite Aid alone was reckless. Consequently, this verdict is not inconsistent.

## VI. JNOV OR NEW TRIAL ABSOLUTE

In the final issue, Rite Aid argues the punitive damages award was excessive as a matter of law, and consequently, it is entitled to a new trial. We disagree.

Our appellate decisions have heretofore recognized three stages for a trial court's review of punitive damages.

First, the court must determine whether the defendant's conduct rises to a sufficient level of culpability to submit the issue to the jury. *South Carolina Farm Bureau Mut. Ins. Co. v. Love Chevrolet*, 324 S.C. 149, 478 S.E.2d 57 (1996). We have already addressed this issue, and find that the trial court was quite right in its decision.

Second, the court must conduct a post trial *Gamble* review to evaluate whether the award deprives the defendant of due process. *Id.* If the court concludes that the defendant's due process rights were violated, a new trial absolute or new trial *nisi remittitur* is required. *Id.*, at 149, 478 S.E.2d at 57.

*Gamble* was decided in response to the Supreme Court's decision in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), which addressed the due process challenge to punitive damage awards primarily in the context of procedural due process. Thus, our court in *Gamble* noted the guidance provided to the jury by the historically acceptable jury instructions, the trial judge's post trial procedural ability to review and decrease a jury verdict which the judge determines to be excessive, and finally, the scope of appellate review.

Here, the trial judge conducted a lengthy and meaningful *Gamble* review and concluded Rite Aid's due process rights were not violated. Notwithstanding the charge to the jury as to Rite Aid's ability to pay punitive damages, the court reviewed extensive information by affidavit and by expert testimony as to Rite Aid's financial status, independently concluding that Rite Aid had the ability to pay the award. The Court set forth its findings as to each of the relevant factors articulated in *Gamble*. We find no abuse of discretion in the trial court's conclusions following its review of the jury verdict. *Gamble; see also South Carolina Farm Bureau Mut. Ins. Co.*, 324 S.C. at 149, 478 S.E.2d at 57 (trial court's decision to modify a jury verdict as excessive or inadequate is reviewed under an abuse of discretion standard).

Following its opinion in *Haslip*, the Supreme Court again addressed the issue of punitive damages in a Fourteenth Amendment Due Process challenge in *TXO Prod. Corp. v.*

*Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The Court determined that a $10,000,000 punitive damage award was sustainable, although the jury awarded only $19,000 in actual damages. The Court rejected either a rational basis analysis or a heightened scrutiny analysis, returning again to its "general concern of reasonableness" to determine whether the award was "so 'grossly excessive' as to violate the substantive component of the Due Process Clause." *Id.*, at 458, 113 S.Ct. 2711. The court rejected the ratio of punitive damages to actual damages of 526 to 1 as a dispositive factor, recognizing instead that "[i]t is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.* at 460, 113 S.Ct. 2711. Finding that the potential of harm in the case was conservatively $1,000,000, the punitive damage award did not "jar [the Court's] constitutional sensibilities." *Id.* at 462, 113 S.Ct. 2711.

In the subsequent case of *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court once again considered a due process challenge to a punitive damage award which was greatly in excess of the actual damages found by the jury. Two underlying factors are important to recognize in an analysis of this case. First, the factual basis for the punitive damage award centered around a violation of Alabama's requirements for automobile manufacturers and dealers in a consumer setting, and those requirements were stricter than the consumer requirements of many other states. Second, the plaintiff did not base his claim for punitive damages on the manufacturer's activities in Alabama alone, but included instances of similar conduct occurring in other states, where it was not illegal or improper. Recognizing that one state may not punish for conduct occurring in another state which is acceptable within that other state, the Court stated that constitutional jurisprudence dictates that a person not only receive notice of the conduct that will subject him to punishment, but also notice of the severity of the penalty that a state may impose. The Court announced three "guideposts" for determining whether a punitive damage

award meets the constitutional requirement of providing fair notice of the magnitude of the sanction. We turn now to an analysis of these punitive damage awards, employing these "guideposts."

### a). Degree of Reprehensibility

The Supreme Court recognized that this first criterion, the degree of reprehensibility of the defendant's conduct, is, perhaps, the most important indicium of the reasonableness of a punitive damages award. We find several aggravating factors associated with Rite Aid's conduct to be present in this case. First, in contrast to the damages in *BMW of North America, Inc.*, the damage to Gabrielle Hundley and to her parents is not economic in nature. Permanent brain damage is among the most significant of personal injuries, and permanently alters the enjoyment of life at its most basic level. Rite Aid's indifference to the life, health and safety of others is at the center of its misconduct. Furthermore, the conduct is repetitive in nature, as demonstrated by Rite Aid's internal documentation and the reports by the Board of Pharmacy. Finally, the record in this case discloses a deliberate course of action by Rite Aid to avoid accountability by concealing the truth.

The court found that Rite Aid's conduct throughout the litigation was abusive and obstructionist, concluding that Rite Aid's misconduct was intentional and in bad faith. The fact of the missing records and the inconsistent answers to interrogatories also formed a part of the Hundleys' argument to the jury, asserting that Rite Aid had engaged in a cover-up. In assessing the defendant's notice that its actions are so objectionable as to give rise to substantial punitive damages, we think this conduct indirectly adds credibility to the argument that Rite Aid's pre-incident approach to quality assurance reflected a conscious indifference to the safety of others. It also indicates that a substantial penalty may be necessary in order to deter future similar conduct.

### b). Ratio

Punitive damages must bear a "reasonable relationship" to compensatory damages. With regard to Gabrielle's award, we find no due process implications from the

ratio of actual to punitive damages. She was awarded $5,000,-000 in actual damages. The punitive damage award is only two times the actual damages awarded. We know of no case in the history of South Carolina which finds such a ratio, in and of itself, to be constitutionally excessive.

 The punitive damage award to the Hundleys was $1,000,000 dollars, which is more than 200 times the actual damage award of $20,000. But as the Supreme Court acknowledged, "[i]ndeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards." *Id.* at 582, 116 S.Ct. 1589. We conclude such circumstances are present here.

First, the non-economic injury to the Hundleys is hard to determine or quantify. Second, as in *TXO,* the amount of punitive damages awarded is reflective of the potential harm in this case and in future cases involving similar conduct. The possibility that Rite Aid's wilful conduct could have resulted in the death of the Hundleys' daughter in this case was very real, as is the potential for such a devastating loss to other victims if similar conduct were not deterred. Even a cursory inspection of our case law demonstrates that an actual damage award far greater than that here would be expected in a wrongful death suit under such circumstances. *See, e.g., Knoke v. South Carolina Dept. of Parks, Recreation and Tourism,* 324 S.C. 136, 478 S.E.2d 256 (1996) ($3 million actual damage award in wrongful death action for death of 12 year old child not grossly excessive); *Lucht v. Youngblood,* 266 S.C. 127, 221 S.E.2d 854 (1976) (actual damage award of $103,000 for death of child was not excessive). Consequently, the ratio of the actual damage award to the punitive damage award, when considered in light of the potential harm, is not grossly excessive such as to offend due process.

### c). Sanctions for Comparable Misconduct

 Comparing the punitive damages awarded and the civil or criminal penalties that could be imposed for similar misconduct provided the third criterion for assessing excessiveness. The dispensing of drugs is highly regulated in South Carolina. *See* S.C.Code Ann. § 40–43–10 et seq. (1986 & Supp.1998). Our legislature has enacted provisions to meet

the challenge of limiting the readily discernable health dangers associated with this activity. In the event of non-compliance with those provisions, the Board of Pharmacy is empowered to suspend or revoke the permit of any drug dispensing facility. Section 40–43–260,[8] in effect at the time of the incident, provided in pertinent part as follows:

E. Misconduct, which constitutes grounds for revocation, suspension or other restriction of a license or a limitation on or other discipline of a licensee shall be satisfactory showing to the board of any of the following:

(7) That the holder of a license is guilty of engaging in any dishonorable, unethical or unprofessional conduct that is likely to deceive, defraud or harm the public.

(10) That the holder of a license has intentionally violated or attempted to violate, directly or indirectly, or is assisting in or abetting the violating or conspiring to violate any provisions or terms of this chapter.

(11) That the holder of a license has been found by the board to lack the ethical or professional competence to practice pharmacy.

S.C.Code Ann. § 40–43–260 (Supp.1997). Consequently, Rite Aid has notice that it can be totally prevented from operating a pharmacy for precisely the kind of conduct alleged to have occurred here.

Furthermore, the inquiry is not confined to the specific provisions governing pharmacies. The misconduct established at trial is that of recklessness in the management of a facility and personnel dispensing drugs, which may proximately cause serious bodily injury to others. The danger inherent in the handling of drugs is reflected in the comprehensiveness of the

---

8. This section was subsequently repealed and replaced in amended form by section 40–43–140, which states in pertinent part:

The board may suspend, revoke, deny, or refuse to renew the permit of a permittee or impose disciplinary action authorized by this chapter for:
(a) violations of any of the provisions of this chapter or any regulations promulgated pursuant to this chapter;
(b) retaining as an employee a person who wilfully or habitually violates any of the state or federal laws applicable to a permitted facility or its operation.
S.C.Code Ann. § 40–43–140 (Supp.1999).

regulatory scheme. *See* § 40–43–10 et seq. (1986 & Supp. 1999).[9] It is analogous to the danger associated with instrumentalities having a like capability to cause harm, such as the operation of automobiles and the handling of weapons. This analogy reveals many instances in South Carolina statutory and common law whereby reckless conduct causing severe injury or death subjects the actor to substantial criminal penalties.[10] Consequently, we conclude the sanctions historically and presently imposed under South Carolina law provide consistent notice that a substantial penalty may be imposed for reckless conduct in the handling of substances which are likely to cause serious harm to others.

We end our analysis where we began it, with the recognition that "[t]he amount of damages, actual and punitive, remains largely within the discretion of the jury, as reviewed by the trial court." *Gamble*, 305 S.C. at 112, 406 S.E.2d at 355. We conclude the punitive damages awarded were not so grossly excessive as to violate due process. The trial court adequately instructed the jury as required under *Gamble*, and conducted an appropriate post-verdict review, arriving at well-reasoned conclusions amply supported by the record. Likewise, the trial court's decision to deny a discretionary reduction in the award is not controlled by any error of law, and we find no abuse of discretion.

For the foregoing reasons, the judgments are

**AFFIRMED.**

CONNOR and HEARN, JJ., concur.

---

9. At the time of this incident, § 40–43–320, since repealed, provided a criminal penalty for any person in violation of the provisions of chapter 43, including a fine not to exceed five hundred dollars or imprisonment not exceeding eighteen months, or both. The chapter was substantially revised in 1998, but retained an extensive regulatory scheme. *See* S.C.Code Ann. § 40–43–86 (Supp.1999) (detailing minimum requirements for permitted facilities).

10. The following are but a few examples: § 40–43–140(2) (Delivery of drugs or devices to a person not permitted to be pharmacist under Chapter 43 of Title 40) 1 year; § 56–5–2920 (Reckless driving) 30 days; § 56–5–2910 (Reckless homicide) 10 years; § 16–3–60 (Involuntary Manslaughter) 5 years; § 56–5–2930 (Driving Under the Influence of Alcohol or Drugs) 5 years; § 56–5–2945 (Felony DUI) 25 years.