JAMES WALTERS, Plaintiff-Appellee, v. YELLOW CAB COMPANY, Defendant-Appellant.

First District (1st Division)    No. 1—92—1914

Opinion filed June 26, 1995.

Jesmer & Harris and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Margarita T. Kulys, of counsel), for appellant.

John R. Wienold & Associates, Ltd., of Chicago (John R. Wienold and Deborah J. Allen, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff James Walters brought suit against defendant Yellow Cab Company (Yellow Cab), Ghales M. Abdullah and Babatunde J.

Abolarin for injuries allegedly suffered when the taxicab in which plaintiff was riding, driven by Abdullah, was struck by a taxicab driven by Abolarin. Both taxicabs were owned by Yellow Cab. Following a jury trial in the circuit court of Cook County, Yellow Cab was found liable for $603,813 in damages.

Yellow Cab appealed. On June 13, 1994, this court issued an opinion affirming the judgment of the circuit court. (*Walters v. Yellow Cab Co.* (1994), 265 Ill. App. 3d 331, 637 N.E.2d 431.) On January 24, 1995, our supreme court entered an order directing this court to reconsider its judgment in light of the supreme court's opinion in *Downing v. Chicago Transit Authority* (1994), 162 Ill. 2d 70, 642 N.E.2d 456. Pursuant to that directive, we now withdraw and reconsider our earlier opinion, but again affirm the judgment of the circuit court for the reasons which follow.

The record on appeal indicates the following facts. Plaintiff filed his complaint against Yellow Cab, Abdullah and Abolarin on May 2, 1986. On October 19, 1990, Yellow Cab moved to quash service on Abdullah and Abolarin. The trial court granted Yellow Cab's motion on July 30, 1991.

On August 28, 1991, Yellow Cab filed a motion to dismiss Abdullah and Abolarin from the suit for failure to timely serve the drivers, pursuant to Illinois Supreme Court Rule 103(b) (134 Ill. 2d R. 103(b)). Yellow Cab prayed that the suit be dismissed as to the drivers "with prejudice," as service had not been performed before the expiration of the applicable statute of limitations. On September 24, 1991, the trial court entered an order that provided that

> "Ghales Abdullah & Babatunde Abolarin be and are dismissed with prejudice; however said dismissal shall not operate as an adjudication on the merits as to the defendant Yellow Cab Co. as provided for in Rule 273 of the Ill. Supreme Court Rules and the dismissal as to Abdullah & Abolarin is with prejudice but not on the merits."

On March 2, 1992, Yellow Cab moved for summary judgment, arguing that the dismissal of Abdullah and Abolarin with prejudice barred the maintenance of a suit against Yellow Cab where liability was based on the doctrine of *respondeat superior*. The trial court denied this motion the following day. The case proceeded to trial.

Plaintiff testified that he was 57 years old. Plaintiff noted that in 1958, he had surgery performed on his right knee. According to plaintiff, he had tripped and a small piece of bone or cartilage became lodged under his kneecap, preventing him from straightening his leg. Plaintiff testified that he recovered full use of his right leg after the surgery.

Plaintiff testified that in 1984, he was senior vice-president of corporate accounts for Basic American Foods. Plaintiff was responsible for developing national chain accounts with companies such as McDonalds, Kentucky Fried Chicken and Sizzler. Plaintiff estimated that he travelled 80% of the time to develop business and call on existing clients. A typical day on the road might last from 6 or 6:30 a.m. through 11 or 11:30 p.m.. Plaintiff would also play tennis in tournaments sponsored by clients or participate in fishing or hiking trips with clients. Plaintiff noted that his right knee might become tired before other parts of his body after five or six sets of tennis.

Plaintiff testified that he came to Chicago for a National Restaurant Association meeting and convention on May 14, 1984. At approximately 2:45 p.m., plaintiff caught a Yellow Cab with co-workers Maxine Anderson, Gordon Lewis and Harold Archibald. Plaintiff stated that he was sitting in the front of the taxicab. Plaintiff testified that their taxicab was normally stopped at a red light at the intersection of Superior and Michigan when it was struck from behind by another Yellow Cab. Plaintiff testified that immediately before the collision, he had his arm resting on the window and was talking to others in his taxicab. Plaintiff testified that when their taxicab was struck, he bounced off of the front dashboard and his knees went into the meter. Their taxicab was pushed into the intersection by the force of the collision.

Plaintiff testified that his arm and shoulder were "killing" him after the collision. Plaintiff believed he had broken his arm. Plaintiff also testified that his knees hurt immediately after the collision and that he later discovered puncture wounds in his skin underneath his pants.

According to plaintiff, the two taxicab drivers were arguing about the collision. Plaintiff offered to escort Maxine Anderson to the Drake Hotel, where she was supposed to meet a friend, while Gordon Lewis obtained names and addresses relating to the collision. Plaintiff noticed that his arm, shoulder, neck, back and knees were hurting as he walked Anderson to the Drake Hotel.

Plaintiff testified that he did not see a doctor immediately after the collision, due to his time schedule. Plaintiff indicated that he took aspirin and put "band-aids" on his knees. Plaintiff testified that over the next several days, he attended only critical lunches and dinners, as his knees were very sore and he had difficulty moving around.

Plaintiff testified that when he returned to San Francisco, he saw his regular physician, Dr. Olson, the following week. Plaintiff indicated that his arm, shoulder, neck, back and knees remained sore; his arm had a "bad bruise" for a month or two. Dr. Olson

examined plaintiff, then referred him to Dr. McDonnell, an orthopedic surgeon. Dr. McDonnell examined plaintiff and prescribed Naprosyn and Motrin. Plaintiff took the medicine for several months, but his shoulder continued to hurt. Plaintiff returned to Dr. McDonnell periodically when he suffered prolonged periods of pain.

Plaintiff testified that his left knee hurt more than his right, with a constant, piercing pain when he walked, sat, or moved his leg a certain way. The right knee did not have the same sort of pain, but it was not strong. Plaintiff indicated that over time, he had increasing difficulty with activities like climbing stairs. Plaintiff testified that his knees would grind when he walked or climbed stairs; he developed a "funny gait" because of the pain of these activities. Plaintiff described himself as very bowlegged at the time of trial. Plaintiff's shoulder worsened from 1985 through 1989. Plaintiff could raise his arm above his head, but it would hurt if he pushed too hard. Plaintiff could no longer paint his house, perform yard work, or carry his briefcase or luggage; he had to use his left arm to reach for a seat belt.

Plaintiff later saw another orthopedic surgeon, Dr. Garrick, who prescribed Feldene in place of Naprosyn; plaintiff was still taking Feldene at the time of trial. Dr. Garrick also referred plaintiff to another orthopedic surgeon, Dr. Wynne. Plaintiff testified that after speaking with Dr. Wynne he had decided to have a procedure called a tibial osteotomy performed on each leg. Plaintiff indicated that he could not kneel or walk more than a block without sitting down.

Plaintiff could no longer play tennis with customers or co-workers, which plaintiff indicated was important from a business standpoint. Plaintiff continued to travel for business and indicated that he would lose business and miss business opportunities if he could not travel. Plaintiff indicated that the deterioration of his condition was such that he was riding in carts to get around airports. Plaintiff testified that the demands on plaintiff to travel increased in 1988, when he left Basic American Foods to start his own business.

The substance of plaintiff's new business was largely the same as the duties he performed at Basic American Foods, but plaintiff was essentially operating by himself, without a supporting staff. Plaintiff's net salary and benefits amounted to approximately $169,000 in 1991. This figure is similar to plaintiff's compensation at Basic American Foods in 1984; his compensation had been as high as $225,000 before his departure in 1988.

The jury also heard testimony taken from the videotaped depositions of several witnesses. For example, Maxine Anderson's videotaped testimony largely corroborated plaintiff's account of the cir-

cumstances surrounding the collision. Anderson also testified that while she and plaintiff were walking to the Drake Hotel, she experienced soreness in her neck and later had a headache. Anderson indicated that she knew plaintiff had been injured, but was unable to indicate how she knew this.

Dr. Garrick testified by videotape that he was the director of a center for sports medicine affiliated with a hospital in San Francisco. Dr. Garrick testified that when he first saw plaintiff on October 8, 1990, plaintiff complained of pain in his knees and shoulder that began after the taxicab collision. Dr. Garrick opined that the plaintiff's problems were related to the collision. Dr. Garrick explained that all people have degenerative changes in their knees over their lifetimes. According to Dr. Garrick, a knee injury or surgery on a knee can cause symptoms to develop at an earlier age than would occur otherwise. Dr. Garrick noted that plaintiff regained full function of his right knee after the surgery in 1958, but indicated that once the left knee was injured, plaintiff would tend to rely more on the previously injured right knee. Dr. Garrick testified that when a patient no longer has a "good knee," he or she will favor one knee until it hurts, then favor the other knee until it hurts, such that one side feeds off the other, resulting in the symptoms suffered by the plaintiff.

Dr. Garrick further testified as to the various options for treating plaintiff. Dr. Garrick opined that the best option would be surgery—either osteotomies or joint replacement. An osteotomy is a procedure by which the leg bones are cut or fractured and then restructured to place more of the patient's weight on the inside of the knees, thereby correcting and perhaps preventing further bowing of the legs. Dr. Garrick testified that he did not perform osteotomies or joint replacement surgery, but that he had his nurse inquire among his associates at his facility and was informed that the cost of an osteotomy would be between $13,000 and $15,000 per knee; joint replacement would amount to approximately $33,000 per knee. Dr. Garrick also estimated the cost of rehabilitation at between $3,000 and $5,000. Dr. Garrick further opined that there was a reasonable chance plaintiff would require bilateral joint replacement in the future. Dr. Garrick indicated that osteotomies should be done one at a time to give the bones involved time to heal. However, Dr. Garrick was unsure whether joint replacement could be done on both knees at once; he did not think he would do both at once, though they might be able to be sequenced closer together than osteotomies.

In addition, Dr. Garrick testified that plaintiff had a shoulder impingement problem that was causally connected to the 1984 taxicab

collision. On cross-examination, Dr. Garrick stated that he was unaware of any shoulder injury relating to plaintiff playing tennis in Dallas after the collision and that such knowledge could have affected his opinion regarding the causation of plaintiff's shoulder condition. Dr. Garrick admitted that there was nothing about plaintiff's condition that indicated it was caused by a single trauma or event. However, Dr. Garrick also opined that given the facts presented, it was unlikely that plaintiff would have the shoulder and knee problems he now has, absent the 1984 collision.

Dr. McDonnell also testified by videotape regarding his diagnosis and treatment of plaintiff. Dr. McDonnell indicated that he performed arthroscopic surgery on plaintiff's left knee on November 5, 1984. Dr. McDonnell testified that he found a torn meniscus, which can be painful when it is caught in the joint surface and the patient already has a preexisting condition such as arthritis. Dr. McDonnell opined that he was fairly certain that the tear in plaintiff's meniscus was probably due to the collision. Dr. McDonnell also indicated that the collision may have aggravated preexisting degenerative changes in plaintiff's knee. Dr. McDonnell indicated that plaintiff might require further surgery on his knees. Dr. McDonnell estimated the cost of total joint replacement at approximately $40,000, which included surgical fees, the anesthesiologist's fee, hospitalization and rehabilitation costs. Dr. McDonnell opined that a patient who had a total knee replacement would probably lose four months of work recuperating.

Dr. McDonnell further indicated that plaintiff had a rotator cuff injury of his shoulder related to the 1984 collision. Dr. McDonnell opined that this injury could be ameliorated by surgery if the symptoms became bad enough. Dr. McDonnell opined that the costs involved would involve magnetic resonance imaging (MRI) costing $500 or $600 and surgery costing between $1,500 and $2,000.

Orthopedic surgeon Earl Fogelberg testified on defendant's behalf. Dr. Fogelberg reviewed the records of Dr. Olson, Dr. McDonnell and the Alta Bates Hospital regarding the condition of plaintiff's shoulder and knees. Dr. Fogelberg also examined plaintiff in 1991. Dr. Fogelberg opined that the status of plaintiff's shoulder and knees was due to preexisting, degenerative conditions and that these conditions were not aggravated by the taxicab collision. For example, Dr. Fogelberg noted that the arthroscopic surgeon had referred to the torn meniscus in plaintiff's left knee as a degenerative tear and Dr. Fogelberg presumed that the tear did not look like a trauma-related acute tear. Dr. Fogelberg also opined that plaintiff's bowleggedness was degenerative and was well established by November 1984.

Similarly, Dr. Fogelberg opined that plaintiff had calcific tendinitis and a degenerative impingement disease in his shoulder.

Dr. Fogelberg also testified that plaintiff gave him a patient history during his examination. According to Dr. Fogelberg, plaintiff discussed a blow to his right arm and that outside of the initial bruise, plaintiff first noted separate shoulder problems three or four months later. Plaintiff testified in rebuttal that he told Dr. Fogelberg about the collision during the examination.

Babatunde Abolarin testified regarding the circumstances of the taxicab collision. Abolarin indicated that both taxicabs were moving when he first saw the taxicab driven by Abdullah. According to Abolarin, Abdullah's taxicab stopped suddenly. Abolarin testified that the ground was wet and that his taxicab hydroplaned into the rear of Abdullah's vehicle. Abolarin testified that he asked whether his passengers were okay, contacted the police and Yellow Cab's insurance adjuster, then returned to the scene. Abolarin stated that no one asked him for medical help at the time.

Following closing argument, instructions and deliberations, the jury returned a verdict in favor of plaintiff for $603,813; the trial court entered judgment on the verdict on March 16, 1992. The trial court denied Yellow Cab's post-trial motion. Yellow Cab then timely filed a notice of appeal to this court.

# I

Initially, Yellow Cab contends that the trial court erred in denying its motion for summary judgment. Although this case proceeded to trial, which normally results in merger of issues raised at summary judgment, defendant presents a question of law that this court may decide *de novo.* (See *Battles v. La Salle National Bank* (1993), 240 Ill. App. 3d 550, 558, 608 N.E.2d 438, 443-44.) Moreover, defendant raised the issue anew in its post-trial motion. Thus, this court will reverse the judgment against Yellow Cab if it is entitled to judgment as a matter of law.

Yellow Cab contends that summary judgment should have been granted, arguing that once Abdullah and Abolarin were dismissed with prejudice for failure to exercise due diligence in service of process pursuant to Illinois Supreme Court Rule 103(b), the claims against Yellow Cab based on the doctrine of *respondeat superior* are barred because the dismissal "with prejudice" operates as an adjudication "on the merits" pursuant to Illinois Supreme Court Rule 273 (134 Ill. 2d R. 273), resulting in *res judicata.*

Rule 103(b) provides as follows:

"If the plaintiff fails to exercise reasonable diligence to obtain service prior to the expiration of the applicable statute of limita-

tions, the action as a whole or as to any unserved defendant may be dismissed without prejudice. *If the failure to exercise reasonable diligence to obtain service occurs after the expiration of the applicable statute of limitations, the dismissal shall be with prejudice.* In either case the dismissal may be made on the application of any defendant or on the court's own motion." (Emphasis added.) (134 Ill. 2d R. 103(b).)

Rule 273 provides:

> "*Unless the order of dismissal* or a statute of this State *otherwise specifies, an involuntary dismissal of an action,* other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, *operates as an adjudication upon the merits.*" (Emphasis added.) 134 Ill. 2d R. 273.

Generally, an adjudication on the merits, rendered by a court of competent jurisdiction, is conclusive of the rights of the parties and their privies and, under the doctrine of *res judicata,* is an absolute bar to a subsequent action against them involving the same claim, demand, or cause of action. (*Towns v. Yellow Cab Co.* (1978), 73 Ill. 2d 113, 382 N.E.2d 1217.) The *Towns* court stated the application of *res judicata* to agency relationships:

> "[A] judgment for either the master or servant, arising out of an action predicated upon the alleged negligence of the servant, bars a subsequent suit against the other for the same claim of negligence where the agency relationship is not in question." (*Towns,* 73 Ill. 2d at 122-23, 382 N.E.2d at 1221.)

In *Towns,* the court held that the dismissal with prejudice of a master as a discovery sanction was an adjudication "on the merits" as to the servant under Rule 273. A similar result generally obtains where the master or servant is dismissed with prejudice pursuant to Rule 103(b). See, *e.g., Martin v. Yellow Cab Co.* (1990), 208 Ill. App. 3d 572, 575, 567 N.E.2d 461, 464.

This case is distinguishable from the *Martin* line of cases, as the trial court here expressly specified in its order that the dismissal of the agents "with prejudice" should not operate as an adjudication "on the merits" as to Yellow Cab. Nevertheless, Yellow Cab argues that: (1) Rule 103(b) mandates that the dismissal *shall* be "with prejudice"; (2) the natural effect of such language is to render the order an adjudication "on the merits"; and (3) a trial court cannot avoid the natural effect of the order by adding language which "otherwise specifies."

■ Our review of Illinois case law indicates that a dismissal "with prejudice" of an agent is not inherently an adjudication "on the merits" as to the principal. In *Edgar County Bank & Trust Co. v.*

*Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, 312 N.E.2d 259, the supreme court held that the dismissal of one defendant with prejudice does not bar an action against other defendants who might be held jointly or severally liable. (*Edgar County Bank & Trust Co.*, 57 Ill. 2d at 302, 312 N.E.2d at 261, *overruled in part on other grounds sub nom. Gilbert v. Sycamore Municipal Hospital* (1993), 156 Ill. 2d 511, 622 N.E.2d 788.) The supreme court cited *Hansel v. Chicago Transit Authority* (1971), 132 Ill. App. 2d 402, 270 N.E.2d 553, which indicated that a Rule 103(b) dismissal of an agent "with prejudice" would not bar the claim against the principal. See *Edgar County Bank & Trust Co.*, 57 Ill. 2d at 302, 312 N.E.2d at 261; *Hansel*, 132 Ill. App. 2d at 409, 270 N.E.2d at 557.

Later, in *Towns*, this court distinguished *Edgar County Bank & Trust Co.* and *Hansel* on the ground that they did not address the effect of Rule 273. (*Towns v. Yellow Cab Co.* (1977), 53 Ill. App. 3d 47, 49, 368 N.E.2d 549, 551, *aff'd* (1978), 73 Ill. 2d 113, 382 N.E.2d 1217.) This reasoning seems to have been endorsed in the supreme court's opinion in *Towns*. (See *Towns*, 73 Ill. 2d at 126, 382 N.E.2d at 1222.) This court similarly distinguished *Hansel* in *Williams v. Bolsten* (1989), 184 Ill. App. 3d 832, 835-36, 540 N.E.2d 966, 968.

The case law therefore indicates that a Rule 103(b) dismissal "with prejudice" as to an agent is deemed to be "on the merits" as to the principal only because of the general provision of Rule 273. Yet Rule 273 also expressly provides that an order of dismissal can specify that it is not an adjudication "on the merits." As cases such as *Towns* and *Martin* dealt only with the general portion of Rule 273, the trial court here did not err in employing one of the exceptions in Rule 273 to specify that the dismissal order should not operate as an adjudication "on the merits" as to Yellow Cab.

The supreme court decision in *Downing v. Chicago Transit Authority* (1994), 162 Ill. 2d 70, 642 N.E.2d 456, does not alter our analysis. *Downing* involved a summary judgment in favor of a Chicago Transit Authority (CTA) employee based on the running of a statute of limitations and thus did not involve the effect of an involuntary dismissal under Rule 273. (*Downing*, 162 Ill. 2d at 72-75, 642 N.E.2d at 457-58.) Moreover, unlike this case, the trial court in *Downing* denied plaintiff's request for language specifying that the order would not operate as an adjudication on the merits as to the CTA. *Downing*, 162 Ill. 2d at 72-73, 642 N.E.2d at 457.

Nevertheless, the *Downing* opinion tends to support the conclusion reached in our earlier opinion. The *Downing* court held that labelling a summary judgment order based on the running of a statute of limitations as an adjudication on the merits "would be the

quintessential act of exalting form over substance." (*Downing*, 162 Ill. 2d at 77, 642 N.E.2d at 460.) Similarly, a Rule 103(b) dismissal for failure to timely serve a defendant does not address the merits, but for the operation of Rule 273. As noted above, however, Rule 273 expressly permits the trial court to specify that a dismissal does not operate as an adjudication on the merits.

In sum, following reconsideration of our earlier opinion in light of *Downing*, we again conclude that the trial court did not err in denying Yellow Cab's motion for summary judgment.

## II

Yellow Cab also contends that the trial court erred in allowing Dr. Garrick to testify regarding the cost of future medical treatment. Yellow Cab maintains that the cost estimates, provided to him by his nurse and based on inquiries to other doctors at his medical facility, were impermissible double hearsay.

In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, our supreme court adopted Rules 703 and 705 of the Federal Rules of Evidence relating to expert opinion. Federal Rule 703 expressly provides that the facts and data underlying an expert opinion need not be admissible in evidence if they are of the sort reasonably relied upon by experts in the field in forming an opinion or inference on the subject. Fed. R. Evid. 703, quoted in *Wilson*, 84 Ill. 2d at 193-94, 417 N.E.2d at 1326.

Yellow Cab asserts that the information was not reasonable and reliable. However, doctors often consult the reports and opinions of specialists, other doctors and nurses and find them reliable in forming their own opinions; indeed, this situation was contemplated by the drafters of Federal Rule 703. (*Rock v. Pickleman* (1991), 214 Ill. App. 3d 368, 374-75, 574 N.E.2d 682, 686-87.) Thus, defendant has failed to show that the trial court abused its discretion in permitting Dr. Garrick's testimony on this point.

## III

Yellow Cab argues that the trial court erred in permitting plaintiff to testify on rebuttal that he had told the defense expert, Dr. Fogelberg, about the circumstances of the taxicab collision when he was examined by Dr. Fogelberg. However, the record does not indicate that defendant objected to the admission of this testimony at trial, which results in waiver of the objection on appeal. See, *e.g.*, *Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 519, 581 N.E.2d 162, 168.

Even if the argument had been preserved, it would not have persuaded this court. "Rebuttal evidence" is that which the plaintiff offers to explain, repel, contradict, or disprove evidence presented by

the defendant. (See *Barth v. Massa* (1990), 201 Ill. App. 3d 19, 33, 558 N.E.2d 528, 537.) A reviewing court will not disturb the trial court's decision to admit or exclude rebuttal evidence, absent an abuse of discretion. *Barth*, 201 Ill. App. 3d at 33, 558 N.E.2d at 537.

In this case, Yellow Cab's expert testified that plaintiff told him only that plaintiff had suffered a blow to the right arm and that plaintiff first noticed shoulder problems three to four months later while leaning on the outstretched arm. Plaintiff's rebuttal testimony that he told Dr. Fogelberg the circumstances surrounding the accident as part of his patient history, while self-serving, was admissible to rebut contrary evidence of nonliability submitted by the defendant. See *Kirkpatrick v. United Federation of Postal Clerk's Benefit Association* (1964), 52 Ill. App. 2d 457, 462, 202 N.E.2d 136, 138.

## IV

Yellow Cab contends that the trial court erred in admitting Maxine Anderson's allegedly irrelevant testimony that she had soreness in her neck and a headache after the collision. The trial transcript does not show that defendant objected to this testimony, but defendant claims that the objection was not waived because the testimony presented was a videotaped deposition and an objection made at that time was edited when it was presented to the jury.

Yellow Cab cites the deposition transcript in support of its contention, but the transcript is not listed in defendant's index of the record on appeal and does not appear to be included in the record, resulting in waiver. Moreover, defendant has given no indication that he ever asked the trial court to rule on the objection, assuming *arguendo* that it was made. Further assuming that defendant has correctly stated the date of the deposition, we note that it was taken more than a month before trial, giving defendant ample opportunity to present the objection, obtain a ruling and have the objectionable material edited from the videotape. Thus, the objection is waived on appeal. *Pharr*, 220 Ill. App. 3d at 518, 581 N.E.2d at 167-68.

## V

Finally, Yellow Cab maintains that the jury's verdict was against the manifest weight of the evidence. Yellow Cab points to the itemized verdict, which shows that the jury awarded no damages for aggravation of a preexisting condition. Yellow Cab argues that the opposite result is clearly apparent, as all of the experts testified that plaintiff's injury was at least partially an aggravation of a previous degenerative condition. This court generally will not order a new trial on damages unless: (1) the damages awarded are manifestly in-

adequate; (2) it is clear that proven elements of damages were not awarded; or (3) the amount bears no relationship to the loss suffered by the plaintiff. *Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407, 485 N.E.2d 4, 6.

■ While the jury heard evidence from the experts suggesting that the trauma of the collision aggravated a preexisting condition, entitling plaintiff to jury instructions on this element of damages, it does not necessarily follow that plaintiff proved damages inherent in that aggravation. For example, the itemized verdict suggests that plaintiff proved lost wages, disability, medical costs and pain and suffering that may have resulted in part from the aggravation of a preexisting condition. However, the jury could have chosen to rely on the testimony that all knees degenerate over time, plaintiff's previously injured knee had regained functionality long before the collision, and any degenerative condition existing in plaintiff may not have been painful absent the trauma of the collision. Given the record on appeal in this case, defendant has not shown that plaintiff proved damages arising from the aggravation itself that are apart from the categories of damages that were awarded.

Nor is the lack of damages for aggravation necessarily tantamount to finding that the damages flowed exclusively from new injuries, as is suggested by defendant. The verdict form did not ask the jury to allocate separate damages for the alleged trauma.

Yellow Cab also claims that two notes sent by the jury to the court during deliberations indicate that the jury was confused about the damages issue. However, the record indicates that these notes related to the issue of whether the jury could consider the claimed injuries to the knees as distinct from the claimed injuries to the shoulder. Defendant has failed to show how that issue relates to the jury's alleged failure to award damages for the aggravation of a preexisting condition in this case.

In sum, defendant has failed to clearly show that proven elements of damages were not awarded. Thus, defendant has not shown that the verdict is against the manifest weight of the evidence.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

WOLFSON and BRADEN, JJ., concur.[1]

---

[1]Justice Wolfson has replaced Justice O'Connor on the panel. Justice Braden has replaced Justice Manning on the panel. They have read the briefs and the previous opinion before concurring in this modified opinion.