NO. 5-98-0016

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____________________________________________________________________________________________

BELLEVILLE TOYOTA, INC., )  Appeal from the 

)  Circuit Court of

     Plaintiff-Appellee, )  St. Clair County.

)

v. )  No. 94-L-13

)

TOYOTA MOTOR SALES, U.S.A., INC., )

and TOYOTA MOTOR DISTRIBUTORS, )

INC., )  Honorable

)  James M. Radcliffe, III,

     Defendants-Appellants. )  Judge, presiding.

_____________________________________________________________________________________________

JUSTICE CHAPMAN delivered the opinion of the court:

This case involves a claim by a Toyota dealership against the defendants, Toyota Motor Sales, U.S.A., the authorized importer of new Toyota vehicles into the United States, and Toyota Motor Distributors, the wholesale distributor of those vehicles (collectively, defendants).  Since 1973, the plaintiff, Belleville Toyota, Inc., doing business as Bill Newbold Toyota (plaintiff), has been selling Toyotas in Belleville, Illinois.  In 1989 plaintiff filed a lawsuit against defendants for an injunction to prevent the opening of a new Toyota dealership in nearby Collinsville, Illinois.  The 1989 action was voluntarily dismissed, but on January 30, 1991, plaintiff filed an amended complaint for defendants' breach of 1975 and 1980 dealer agreements.  The amended complaint claimed that defendants did not allocate to plaintiff all of the vehicles it should have.  On July 20, 1992, plaintiff filed a second amended complaint in which it claimed that defendants' allocation of vehicles violated section 4(d) of the Motor Vehicle Franchise Act (the Act) (815 ILCS 710/4(d) (West 1998)).  Plaintiff's claim of the misallocation of vehicles by defendants was the thrust of the evidence produced in a jury trial, which resulted in a verdict for plaintiff in 1997 and a special-interrogatory response that defendants' conduct was willful and wanton.  After the jury's verdict, the trial judge trebled the damages pursuant to the provisions of the Act.  Defendants perfected a timely appeal and raise the following claims for review:

Defendants are entitled to a judgment notwithstanding the verdict or, alternatively, a new trial on plaintiff's breach-of-contract claim because defendants complied with the terms of the contracts.

Plaintiff released any claims it had prior to September 6, 1988, because it entered into a dealer agreement on that date that contained a general release.

Plaintiff failed to prove proximate cause or damages with respect to any of its claims.

Plaintiff is not entitled to recover under the Act for several reasons.

The claims are barred by the statutes of limitation.

The court erred in denying defendants' instructions on the statutes of limitation.

Defendants are entitled to a new trial because the jury's verdicts are irreconcilably inconsistent.

Defendants claim that they are entitled to a judgment 
n.o.v.
 or a new trial because they complied with all the terms of the contracts.  The disputed contractual terms involved in this case relate to the defendants' method for the allocation of vehicles.  Plaintiff contended that defendants breached either or both of the following sections of the contracts.  If there was no shortage of vehicles, then the following 1980 contract language applied:

"Dealer shall submit orders for TOYOTA products to DISTRIBUTOR upon order forms supplied by DISTRIBUTOR.  DISTRIBUTOR may accept such orders in whole or in part by notice in writing to DEALER or by actual delivery to DEALER.

* * *

DISTRIBUTOR agrees to provide TOYOTA products to DEALER in such quantities and types as are ordered by DEALER, subject to available supply from IMPORTER and subject to change or discontinuance at any time with respect to any TOYOTA product."

The 1986-1988 dealer agreements contain different language for the nonshortage situation:

"DISTRIBUTOR agrees to use its best efforts to provide Toyota Products to DEALER in such quantities and types as may be required by DEALER to fulfill its obligations with respect to the sale and serving of Toyota Products under this Agreement, subject to available supply from IMPORTER, DISTRIBUTORS, marketing requirements, and any change or discontinuance with respect to any Toyota Product."

Plaintiff contends that the above provisions required defendants to furnish all the cars that plaintiff ordered.  Defendants adamantly argue that no such duty can be gleaned from the language of any of the agreements, especially from the language of the 1986-1988 agreements.  Although we might agree with defendants' interpretation of the agreements on this point, we do not need to rule on this issue in view of our resolution of the contractual requirements for times in which there was a shortage of available vehicles.

Plaintiff certainly does not concede that defendants' position is correct on the order provision, but it does contend on appeal, as it did at the trial, that the main thrust of its action is that there was a shortage of vehicles during the period involved and that defendants did not allocate vehicles as they were supposed to during this period of shortage.  The contractual provisions that governed vehicle allocation during times of shortage are as follows:

"1980 Dealer Agreement–DISTRIBUTOR and DEALER recognize that TOYOTA motor vehicles may not be available in sufficient supply from time to time because of production limitations or other factors.  Where such shortage is expected to exist for a significant period, it is understood and agreed that such vehicles will be allocated by DISTRIBUTOR to DEALER 
principally on the basis of sales performance during the most recent representative period of adequate supply
 ***." 

* * *

1986-1988 Dealer Agreements.  Where such a shortage is determined by DISTRIBUTOR to exist, DISTRIBUTOR will endeavor to allocate the affected Toyota Product(s) among its dealers 
in a fair and equitable manner, which it shall determine in its sole discretion
."  (Emphasis added.)

Defendants contended throughout the trial, from the time of their opening statement and through their closing argument, that there was absolutely no evidence of a shortage of Toyota vehicles during the 1980s.  This position was simply not supported by the evidence.

Plaintiff's principals, Bill and Kent Newbold, testified that there was a shortage for two reasons:

The oil crisis of the 1970s created a demand for small, fuel-efficient cars that American manufacturers were not as well prepared to fill as were foreign manufacturers, including Toyota.

In 1981 the Voluntary Restraint Agreement entered into between the Japanese and the United States governments restricted the number of Toyota vehicles that could be imported into the United States. 

Other dealers supported the plaintiffs on these points.  In addition, when pushed on cross-examination, representatives of defendants conceded that if the word "shortage" was defined as an excess of demand for cars over the number of cars available, then indeed there was a shortage of vehicles.  Therefore, although the presence or absence of a shortage of vehicles was a contested fact issue, there was certainly sufficient evidence presented to establish a shortage.    

Once evidence of a shortage was presented, the allocation language quoted above became material, and this language, particularly that contained in the 1980 dealer agreement, was the primary focus of most of the testimony in the case.  The allocation methods at issue used both computer programs to determine the appropriate number of vehicles to be allocated to dealers under normal circumstances of shortage and a discretionary source called the regional managers pool, which gave regional managers discretion over approximately 10% of the vehicles within a region.  Plaintiff was in defendants' Chicago region. 

Plaintiff attacked both of defendants' allocation methods.  First, plaintiff contended and presented evidence to support its contention that defendants' allocation of vehicles was by neither the method set out in the dealer agreements–the "last-period-of-adequate-supply" method–nor the method that defendants' representatives told the plaintiffs it was using–the "turn-and-earn" method–but was instead a third method called the "balanced-day-supply" method.  Defendants' witnesses admitted that its actual allocation method was not the one that it told dealers it used.  In addition, plaintiff presented a Toyota internal memorandum, authored by the general manager of defendants' Chicago region, which stated the following:

"The present system is very complex and lacks credibility with our dealers.  Although it can be explained as a 'turn[-]and[-]earn' system, the projected result of any factor or series of factors cannot be easily simulated.

* * *

Present dealer understanding of our allocation system is essentially that 'turn[-]and[-]earn' is a must.  A full understanding of how various factors work within the system is limited to only a few dealers.  The complexity of each of the various increments is the most difficult to develop and maintain a clear understanding ***."

Second, plaintiff contended that defendants' Chicago regional managers did not stay within the 10% discretionary range when distributing cars from the regional manager's pool but that they routinely went beyond that range and that they did it without written approval, which was in violation of defendants' own requirements.  Plaintiff contended that these activities resulted in its receiving significantly fewer vehicles than it was entitled to and that, in view of the excess demand for Toyotas during this period, plaintiff could have easily sold those additional vehicles that it should have received.  

Plaintiff called two experts, Robert Benson and Dr. Ostlund, to support its claim.  Benson testified that his examination of defendants' computer program for the allocation of vehicles revealed that it had a great many parameters built into it that gave defendants a significant amount of discretion in its allocation decisions.  Benson did not testify that defendants used the flexible system in any deleterious way, only that the system gave defendants the capability of manipulating the numbers of vehicles allocated.

Dr. Ostlund presented his calculation of the losses plaintiff incurred based on the number of vehicles allocated to plaintiff under the balanced-day-supply method as compared to the number of vehicles plaintiff would have received under both the last-period-of-adequate-supply or dealer-agreement method and the turn-and-earn or Toyota-

representative method.  In Ostlund's opinion, plaintiff lost approximately $5 million over the time period involved.

Plaintiff's evidence did not go unchallenged.  Both through vigorous cross-examination and through the use of its own witnesses, defendants countered plaintiff's theory.  The question before us on this issue, however, is not which side should prevail.  Instead, the question is whether all of the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors defendant that a contrary verdict could never stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967).

On the basis of this record, we conclude that the trial court did not err in denying defendants' motion for judgment 
n.o.v.
  We also conclude that there was no error in the court's denial of defendants' motion for a new trial.  Although the standard of review for the ruling on the new-trial motion is different than the 
Pedrick
 standard, we conclude that the trial court properly resolved this issue in plaintiff's favor, since such a finding was not against the manifest weight of the evidence.  See 
Maple v. Gustafson
, 151 Ill. 2d 445, 603 N.E.2d 508 (1992).

Turning to defendants' second argument, that the trial court erred in denying its summary judgment motion based on release language contained in the 1986-1988 dealer agreements, we note that the release language provides as follows:

"[Each party] releases the other from any and all claims, causes of action, or otherwise that it may have against the other for money damages arising from any event occurring prior to the date of execution of this Agreement."  

Defendants contend that this language clearly releases it from all claims prior to the 1986 agreement.

Plaintiff responds that defendants waived any issue regarding the release by failing to tender any instructions on the issue.  We agree with plaintiff that it was incumbent upon defendants to tender instructions on this issue to preserve for appeal its claim of error.  See 
Deal v. Byford
, 127 Ill. 2d 192, 537 N.E.2d 267 (1989).

Defendants next contend that it was unnecessary for them to tender an instruction on the release issue, because the trial court erred as a matter of law in denying its motion for summary judgment on this point.  In most cases, an order denying a motion for summary judgment merges with the judgment entered on the verdict and is not appealable.  
Labate v. Data Forms, Inc.
, 288 Ill. App. 3d 738, 682 N.E.2d 91 (1997).  In some cases, however, it has been held that if the issue raised in the summary judgment motion is one of law and should not have been given to the jury for resolution, the order denying the summary judgment motion does not merge.  
Walters v. Yellow Cab Co.
, 273 Ill. App. 3d 729, 653 N.E.2d 785 (1995).  The release issue in this case involved factual disputes.  First, Kent Newbold's affidavit in opposition to the summary judgment motion stated that the release was not a part of the dealer agreement at the time that it was signed.  Second, the document defendants rely upon provides that the parties did not release "claims which either party does not know or reasonably suspect to exist in its favor at the time of the execution of this Agreement."  Kent Newbold's affidavit stated that he did not know or suspect the existence of the claims when the agreements were executed.  Although defendants disagree with these two verified statements, the statements present disputed issues of fact, and therefore, the ruling on the summary judgment motion merges with the judgment order and is not appealable.  See 
Labate
, 288 Ill. App. 3d 738, 682 N.E.2d 91.

Defendants' next point on appeal is that plaintiff failed to prove the proximate cause of its claimed damages, and it submits several arguments in support of its contention.  Defendants' first argument on this point is based on their contention that plaintiff's expert admitted that he could not establish causation.  Defendants contend that plaintiff's expert assumed (1) that plaintiff would have ordered a certain number of vehicles in the given years, (2) that plaintiff would have sold those vehicles, and (3) that defendants' failure to furnish that number of vehicles caused plaintiff's damages.  Defendants contend that, in spite of Ostlund's assumptions, he admitted that he could not quantify in any detail the harm suffered by plaintiff.  Defendants' second argument on this point is that plaintiff failed to prove causation within a reasonable degree of certainty.

Plaintiff responds that defendants' first argument essentially sets forth plaintiff's causation connection.  Plaintiff argues that but for defendants' failure to allocate the appropriate, and larger, number of vehicles to plaintiff, plaintiff would have sold that larger number and therein lies its proof of causation, and plaintiff contends that the proof is within a reasonable degree of certainty.  Plaintiff argues that a comparison of the number of vehicles it should have received to the number it actually received is precisely the analysis that should be used.  Plaintiff cites 
Jay Edwards, Inc. v. New England Toyota Distributor, Inc.
, 708 F.2d 814 (1st Cir. 1983).  In 
Jay Edwards, Inc.
, the court approved the plaintiff's presentation of evidence that its dealership was offered some 300 fewer cars per year than was a comparable dealership.  The plaintiff in 
Jay Edwards, Inc.
 based its damages on the loss of profits from the smaller number of cars available to it multiplied by the profit per vehicle it would have received on each car.  

Defendants' next two arguments on the causation issue are that plaintiff failed to account for intersecting causes that could have caused the loss in its profits (see 
Midland Hotel Corp. v. Reuben H. Donnelley Corp.
, 118 Ill. 2d 306, 515 N.E.2d 61 (1987)) and that Ostlund's damage models are not based on the facts.  According to defendants, plaintiff's expert, Ostlund, testified to many factors that could affect plaintiff's sales and profitability, such as the location of the dealership, the quality and number of personnel, and pricing practices.  Defendants criticize Ostlund's analysis because it focused strictly on the availability of vehicles and because he did not point to specific facts to establish plaintiff's losses.  

Plaintiff responds that the analysis outlined by Ostlund was based on plaintiff's actual business performance during the time involved and that it therefore reflected the various intersecting factors that affect profits.  In addition, and with specific regard to defendants' contention that the damage models were not based on actual data, plaintiff points out that Ostlund not only calculated the number of vehicles that should have been allocated to plaintiff but also calculated the average gross profit that plaintiff made from each new Toyota vehicle sold in each year in issue.  Then, in order to arrive at a net profit per vehicle, Ostlund deducted numerous expenses derived directly from plaintiff's financial statements.

We agree with plaintiff that the primary case relied upon by defendants, 
Midland Hotel Corp.
, is distinguishable.  In 
Midland Hotel Corp.
, the plaintiff hotel sought damages for the breach of a contract to include it in a new telephone directory.  To establish its lost profits, the plaintiff presented evidence of the variance between the plaintiff's occupancy percentage and the average occupancy percentage of other Chicago hotels.  The percentages were derived from a trade publication called Trends In The Hotel Industry (Trends).  The plaintiff's expert assumed that since the plaintiff's average occupancy rate for the 30-month period immediately preceding the publication of the directory was approximately 1% below the average rate published in Trends, it was reasonable to assume that the occupancy rates would have continued to correspond, except for the fact that the defendant had omitted the plaintiff from its directory in 1981.  The supreme court rejected this contention because the averages did not sufficiently indicate what was happening.  In fact, the plaintiff's occupancy rate had been much higher in 1979 but had been decreasing even before the 1981 publication of the directory.  In addition, even though the plaintiff was included in the 1982 directory, its occupancy rate continued to decline.  The supreme court concluded that if the exclusion from the directory in 1981 caused substantial losses, then one would expect that the inclusion in the directory in 1982 would result in at least modest gains.  Therefore, the supreme court concluded that the plaintiff's expert's assumption about occupancy rates was unfounded and did not support the verdict.

In contrast, in this case the crucial assumption by plaintiff's expert is that, in times of shortage, if additional vehicles had been allocated to plaintiff, those vehicles could have been sold, and on this common-sense point even some of defendants' witnesses agreed.

We agree with plaintiff that the analysis of Ostlund, which, as he indicated, is a methodology that is reasonably accepted in the field of automobile finance, effectively accounted for intersecting factors and was sufficiently based on actual data to survive defendants' challenge.  See 
Earl Evans Chevrolet, Inc. v. General Motors Corp.
, 74 Ohio App. 3d 266, 598 N.E.2d 1187 (1991); 
Malatesta v. Leichter
, 186 Ill. App. 3d 602, 542 N.E.2d 768 (1989); 
Tower Oil & Technology Co. v. Buckley
, 99 Ill. App. 3d 637, 425 N.E.2d 1060 (1981). 

Defendants' next attack on the causation issue is based on the fact that Ostlund testified to eight different potential awards that encompassed a range from approximately $5 million to approximately $11 million.  Defendants contend that Ostlund's presentation of eight possibilities within a range of $6 million establishes that plaintiff was unable to establish damages within a reasonable degree of certainty.  Plaintiff responds that the alternative damage estimates were entirely appropriate because the correct measure of damages depended upon the outcome of factual disputes that the jury had to resolve.  For example, if the jury found that there was no shortage of vehicles,  it might still consider damages based on plaintiff's theory that an order system was in existence.  We agree with plaintiff that since alternative theories and different periods were involved, it was appropriate for different estimates of damages based on the different factors to be supplied to the jury.  See 
Hills of Palos Condominium Ass'n, Inc. v. I-Del, Inc.
, 255 Ill. App. 3d 448, 626 N.E.2d 1311 (1993); 
Landes Construction Co. v. Royal Bank of Canada
, 833 F.2d 1365 (9th Cir. 1987); see also 
Earl Evans Chevrolet, Inc.
, 74 Ohio App. 3d 266, 598 N.E.2d 1187; 
Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.
, 806 F.2d 953 (10th Cir. 1986).  

Defendants' final contention on the causation issue is that plaintiff's claimed damages were improperly inflated by prejudgment interest, which plaintiff was not entitled to recover.  Plaintiff's first response is that Ostlund did not testify about prejudgment interest but about reinvestment earnings and interest recovery.  According to defendants, Ostlund's reinvestment theory assumed that plaintiff would have reinvested every dollar of lost profit in the business and would have earned a return on this reinvestment and that this is nothing more than prejudgment interest in another guise.  See 
Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.
, 285 Ill. App. 3d 914, 674 N.E.2d 948 (1996).  Plaintiff's second response is that even if the reinvestment testimony was improperly admitted, defendants were not prejudiced, because the jury did not return an award for those claimed damages.  In support of this argument, plaintiff points to the cross-examination of Ostlund, during which he was asked to exclude several categories of plaintiff's damages, including the claimed prejudgment damages.  The results of those exclusions were damage estimates ranging from $2.1 million to $3.7 million.  Since it is apparent from the jury's verdicts of $2.25 and $2.5 million that the reinvestment portion of plaintiff's claimed damages was not awarded to plaintiff, we conclude that Ostlund's testimony on this point, even if erroneously admitted, did not rise to the level of reversible error.  

Defendants' next claim is that plaintiff was not entitled to recover under the Act for several reasons, that its vehicle-allocation system was not arbitrary and capricious, either in general or in its particular application as to plaintiff, and that the court improperly refused defendants' instruction that defined "arbitrary and capricious."  In addition, defendants challenge the trial court's award of treble damages under the Act and the constitutionality of section 4(d)(1) of the Act, which provides:

"(d) It shall be deemed a violation for a *** distributor ***:

(1)  to adopt, change, establish[,] or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious."  815 ILCS 710/4(d)(1) (West 1998).

Defendants first argue that the balanced-days-supply system was not arbitrary and capricious as to dealers in general because defendants had sound business reasons for its use.  For example, defendants point out that the parameters built into the system, which were described by plaintiff's expert, Benson, although perhaps giving it the ability to manipulate, which Benson discussed, also served the sound business purpose of giving it flexibility, which Benson admitted.  Plaintiff responds that the adjustable parameters that defendants built into its computer allocation systems were designed to allow management to manipulate the results of allocations and that the jury could consider the evidence that defendants either did not create or destroyed documentation of how the parameters were set.  In addition, plaintiff points out that although defendants promised dealers that these allocations would be calculated on a turn-and-earn system, the allocation system did not give turn-and-earn results.  Finally, plaintiff points out that one of defendants' internal memoranda stated, "The projected result of any factor or series of factors [in the allocation system] cannot be easily simulated."

In view of these items of evidence and others, plaintiff contends that defendants' reliance upon 
Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.
, 773 F.2d 1193 (11th Cir. 1985) (
Cabriolet
), is misplaced.  Defendants contend that the 
Cabriolet
 court reversed a judgment against Honda that had used a balanced-day-supply model similar to the one employed by defendants.  Therefore, according to defendants, the balanced-day-supply model it used could not have been arbitrary and capricious.  Plaintiff challenges the applicability of 
Cabriolet
 to this case because the reversal was based upon the record in that case and the plaintiff's failure in that case to establish that Honda's conduct was arbitrary.  

A perusal of this record makes it clear that the result in 
Cabriolet
 was based upon a record considerably different than the record before this court.  For example, in 
Cabriolet
, both parties agreed that the allocation system used by Honda was the balanced-day-supply system.  In this case, there is certainly no agreement on that issue.  In addition, in 
Cabriolet
 the evidence about the 15% hold-back cars, a system similar to defendants' 10% regional manager's pool, was significantly different.  In 
Cabriolet
, the Honda employees had to account for the cars distributed from the 15% pool, while in this case plaintiff presented evidence that defendants' regional managers used their discretion to allocate vehicles to dealers just to improve the dealer's future allocation, without any identification of special circumstances, and that the managers allocated excessive numbers of vehicles to certain dealers without regard for the numerical limits set in defendants' own policy manual.  Therefore, we conclude that 
Cabriolet
 is distinguishable, that plaintiff submitted sufficient evidence to establish that defendants violated the Act, and that the trial court properly denied defendants' motion for judgment 
n.o.v.
 and for a new trial on that claim.  See 
Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp., U.S.A.
, 188 Ill. App. 3d 664, 544 N.E.2d 457 (1989).

Defendants' next argument on the statutory claim is that the trial court improperly refused to define the words "arbitrary and capricious" that are contained in the Act.  The mere fact that words are contained in a statute does not mean that they require an instruction defining them to make them intelligible to a jury.  As long as the words are understandable and are used in their conventional sense, there is no necessity to define them.  The authorities cited by defendants, 
Olympic Chevrolet, Inc. v. General Motors Corp.
, 959 F. Supp. 918 (N.D. Ill. 1997), 
Schott Motorcycle Supply, Inc. v. American Honda Motor Co.
, 976 F.2d 58 (1st Cir. 1992), and 
Thoroughbred Ford, Inc. v. Ford Motor Co.
, 908 S.W.2d 719 (Mo. App. 1995), define the terms by using definitions from standard dictionaries.  

Defendants' reliance upon 
Head v. Lutheran General Hospital
, 163 Ill. App. 3d 682, 516 N.E.2d 921 (1987), is unpersuasive for three reasons.  First, although 
Head
 approved one definition of arbitrary and capricious, it did not hold that a definition was required. Second, the definition of arbitrary and capricious submitted by defendants is not the one approved by 
Head
.  Third, our supreme court has held, "It is well established that the meaning of words, used in their conventional sense, need not be defined or explained in giving instructions to the jury."  
Larson v. Commonwealth Edison Co.
, 33 Ill. 2d 316, 323, 211 N.E.2d 247, 252 (1965); see 
Kingston v. Turner
, 115 Ill. 2d 445, 459, 505 N.E.2d 320, 326 (1987).  Therefore, we conclude that the trial court did not err in refusing defendants' definition of arbitrary and capricious.

We now turn to defendants' criticism of the jury's finding of willful or wanton conduct on the statutory claim and the trial court's award of treble damages.  Defendants' first point on this issue is that the trial court erroneously gave Illinois Pattern Jury Instructions, Civil, No. 14.01 (3d ed. 1995) (hereinafter IPI) as its definition of willful and wanton.  Defendants quote from 
Loitz v. Remington Arms Co.
, 138 Ill. 2d 404, 563 N.E.2d 397 (1990), on punitive damages:

"[T]hese damages can be awarded only for conduct for which this remedy is appropriate–which is to say, 
conduct involving some element of outrage similar to that usually found in a crime
.  The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with 
reckless indifference
 to the rights of others."  (Emphasis added.)  
Loitz
, 138 Ill. 2d at 415-16, 563 N.E.2d at 402.

The next sentence in the supreme court's opinion is:

"In this context, willful and wanton misconduct 'approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in 
conscious disregard
 of it.' " (Emphasis added.)  
Loitz
, 138 Ill. 2d at 416, 563 N.E.2d at 402. 

The first emphasized portion of the preceding quotes is the language contained in defendants' tendered and refused instruction on this point.  The last two emphasized phrases, "reckless indifference" and "conscious disregard," are much closer to IPI No. 14.01's language "utter indifference to or conscious disregard of."  In view of the greater similarity of the latter emphasized quotations to the IPI language and particularly in view of the admonition of Supreme Court Rule 239 (177 Ill. 2d R. 239) to trial courts to use IPI instructions whenever they cover the circumstances, we conclude that the trial court did not err in refusing defendants' tendered definition and instead instructing in the language of IPI No. 14.01.

Defendants next contend that even assuming that the jury was properly instructed on this point, its finding that defendants' conduct was willful and wanton is against the manifest weight of the evidence.  In support of its argument, defendants point to certain evidence that showed their concern for dealers in general and for plaintiff in particular.  Plaintiff counters with examples of evidence to the contrary.  In addition to evidence already alluded to, plaintiff contends that defendants' allocation system in the Chicago region favored dealers in Chicago, because they received vehicles days earlier than Southern Illinois dealers because of the Chicago dealers' proximity to the railhead.  Plaintiff argues that although this resulted in Chicago dealers receiving more cars to plaintiff's detriment and although defendants could have compensated for this delivery delay in its computer allocation program, they did not.  Further, plaintiff points out that it presented evidence that numerous dealers complained to defendants about the allocation system but despite these complaints, defendants never tested the system to see if their allocation results were consistent with their turn-and-

earn claims.  Finally, plaintiff presented evidence that the regional pool managers improperly allocated vehicles and concealed from dealers the effect of regional pool awards on future allocations.  In view of the evidence presented, we conclude that the jury's finding of willful and wanton was not against the manifest weight of the evidence.

Defendants' next contention is that the trial court's award of treble damages was erroneous because the court failed to consider factors pertinent to such a determination.  Defendants cite 
Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp., U.S.A.
, 188 Ill. App. 3d 664, 544 N.E.2d 457 (1989) (
Kawasaki Shop
), for the proposition that it is incumbent upon trial courts to consider the four factors considered by the trial court in 
Kawasaki Shop
.  This, however, is not the holding of 
Kawasaki Shop
.  Although the appellate court noted four factors the trial court considered, the appellate court in no way made the consideration of those factors a mandatory step in trial court decisions on whether to award treble damages.  
Kawasaki Shop
 simply held that the trial court's decision to refuse treble damages based on the record in that case was not an abuse of discretion.  Similarly, we conclude that the trial court's decision to award treble damages based on the evidence already alluded to in this case was not an abuse of discretion.

Defendants' final point regarding the statutory claim is that section 4(d)(1) of the Act is unconstitutionally vague and in violation of defendants' due process rights.  Defendants contend that the statute's language that makes it unlawful to "adopt, change, establish[,] or implement" an allocation system that is "arbitrary or capricious" (815 ILCS 710/4(d)(1) (West 1998)) fails to specifically delineate the types of conduct that violate the Act or the types of allocation systems that are impermissible.  These failures, defendants contend, mean that the statute does not convey sufficient notice and fair warning of what conduct is proscribed and that, therefore, the statute is unconstitutional.

Although plaintiff contends that defendants waived this contention because they did not raise it until they filed their posttrial motion, we disagree.  Constitutional challenges can be raised at any time.  
Brown v. Department of Public Aid
, 274 Ill. App. 3d 410, 654 N.E.2d 582 (1995), 
vacated on other grounds
, 167 Ill. 2d 550, 665 N.E.2d 841 (1996).  Therefore, we will not consider defendants' argument on this point to be waived.

Defendants' contention on this point is similar to that raised earlier on the necessity to define the terms "arbitrary and capricious" by instruction.  In this argument, however, defendants contend that the failure to provide a definition rises to the level of an unconstitutional deprivation of due process.  We cannot agree.  The terms arbitrary and capricious are neither so esoteric nor so vague as to require specific definition.  Statutes enjoy a presumption of constitutionality, and the party who challenges them has the burden of establishing their invalidity.  
People v. Warren
, 173 Ill. 2d 348, 671 N.E.2d 700 (1996).  If the terms in a statute have a readily discernible common meaning, they are sufficiently specific to notify those subject to them of the conduct that is prohibited.  
Desnick v. Department of Professional Regulation
, 171 Ill. 2d 510, 665 N.E.2d 1346 (1996).  The terms 
arbitrary
 (without fair or substantial reason) and 
capricious
 (unpredictable) are sufficiently specific, and we conclude that section 4(d)(1) is constitutional.

The next issue raised by defendants is their statute-of-limitation defense, which was raised by a motion to dismiss and by a motion for summary judgment, both of which were denied.  Defendants contend that the breach-of-

contract action was barred by the four-year statute under the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 
et seq.
 (West 1998)) for the 1980 contract, which contained a choice-of-law provision, under California's four-year statute of limitation.  As to plaintiff's claim under the Act, defendants assert that it is barred by that Act's four-year statute of limitation.  On the breach-of-contract claim, plaintiff responds with the contention, among others, that the UCC should not apply because defendants provided in three of the form agreements as follows:  "This is a personal service contract."  Because personal service contracts are not governed by the UCC, plaintiff contends that Illinois's 10-year statute of limitation should apply.  As to the choice-of-law provision, plaintiff argues that statutes of limitation are procedural, to be determined by the law of the forum, and that, therefore, Illinois's 10-year statute should apply.

As to the statutory claim, plaintiff relies upon its claim that the violation of the Act was a continuing violation and that, therefore, the statute of limitation did not come into play because the violations continued throughout the period of the claim.

Although the parties' positions on the breach-of-contract claim are well argued, we need not extend the length of this opinion by addressing them in any further detail, because we conclude that the trial court properly applied the continuing-violation rule to the statutory claim.  Since the jury found for plaintiff on both claims and since the trial court ruled that the larger award on the breach-of-contract claim could be satisfied by a payment of the lesser award on the statutory claim, it is unnecessary to rule on the statute-of-limitation defense on the breach-of-contract claim or on whether the continuing-violation rule applies to the contract claims.  See 735 ILCS 5/2-1201(d) (West 1998); 
Yates v. Chicago National League Ball Club, Inc.
, 230 Ill. App. 3d 472, 595 N.E.2d 570 (1992).   

Turning to the statute-of-limitation defense on the statutory claim, defendants argue that the trial court should have allowed its pretrial motions or, in the alternative, it should have given to the jury defendants' tendered instructions on that issue.  

The trial court apparently concluded that the continuing violation of the Act tolled the running of the statute of limitation.  Although there is little authority on this point, we note that a violation of a similar federal statute, the Automobile Dealers' Day in Court Act (15 U.S.C., §1221 
et seq.
 (1970)), has been held to involve continuing discriminating practices that were not barred by the statute of limitation.  See 
Evanston Motor Co. v. Mid-Southern Toyota Distributors, Inc.
, 436 F. Supp. 1370 (N.D. Ill. 1977).

More persuasive, however, are the words of Justice Heiple in 
Cunningham v. Huffman
, 154 Ill. 2d 398, 609 N.E.2d 321 (1993).  Although 
Cunningham
 involved the determination of the effect of a continuing course of negligent treatment on the statute of repose in medical malpractice cases, a situation factually dissimilar from this case, we find the following analysis instructive:  

"In construing the meaning of the phrase 'the act or omission or occurrence,' we find it improbable that the General Assembly intended the word 'occurrence' to be limited to a single event.  ***

Further, to so narrowly construe this phrase could lead to absurd and unjust results.  For example, if the word occurrence were interpreted to mean a single isolated event, patients who discovered that they were gravely injured due to negligent or unnecessary exposure to X-ray radiation or administration of medication over a span of years might be able to recover little, if any, in the way of damages.  This would be so because a single dosage of radiation or medicine might be harmless, whereas treatment over time might be either disabling or even fatal.  When the cumulative results of continued negligence are the cause of the injury, the statute of repose cannot start to run until the last date of negligent treatment.  If the statute of repose were read to start on day one of the treatment in a span covering many years, a plaintiff could only seek recovery for the final four years.  It is conceivable that the damage caused in the last four years might be either negligible or a small fraction of the harm caused over the continuum of negligence; thus, the recovery of damages would be negligible compared to the actual injury.  Surely, the law could not contemplate such an unjust result."  
Cunningham
, 154 Ill. 2d at 405-06, 609 N.E.2d at 325.

Applying the 
Cunningham
 analysis to this case, we first compare the conduct involved:  simple negligence in the malpractice arena 
vis-a-vis
 in this case a willful and wanton violation of a statute passed to protect dealers.  Next, we compare the effect of the conduct:  cumulative insults over time in the malpractice case, the combination of which results in an injury that might otherwise be insignificant, 
vis-a-vis
 in this case damages that are incurred over a period of years, which result in a loss that at some point becomes intolerable.  Finally, and most importantly, we consider the continuing nature of defendants' conduct.  It is not true, as defendants argue, that taken to its logical end, the trial court would have allowed plaintiff to challenge defendants' conduct indefinitely because, under the continuing-violation rule, once the conduct stops, the statute of limitation begins to run.  In this case, the conduct never stopped.

Turning next to the trial court's refusal to give defendants' instructions and special interrogatory on the statute-

of-limitation issue, we observe initially that each party is entitled to have the court instruct the jury on its theory of the case that is presented as an issue in the pleadings and preserved in the evidence.  
Galowich v. Beech Aircraft Corp.
, 209 Ill. App. 3d 128, 568 N.E.2d 46 (1991).  We further observe, however, that defendants' instructions and special interrogatory deal with the time that plaintiff knew or should have known of the conduct for which damages were sought.  The trial court was not treating this case as a discovery exception to the statute of limitation.  The court's pretrial orders denying defendants' motions mentioned fraudulent concealment and continuing violation as their bases.  The evidence at the trial presented some, albeit limited, support for fraudulent concealment, but plaintiff did not pursue that avenue.  As to continuing violation, however, there was really no factual dispute for the jury to resolve on that point.  There was absolutely no question that the evidence of the violation of the Act showed that it continued throughout the entire period for which damages were claimed.  Therefore, there was no factual issue for the jury to resolve on this point and no need for it to be instructed on it.  The discovery instructions tendered by defendants do not relate to the continuing-violation evidence and are simply irrelevant to that issue.  See 
Field v. First National Bank of Harrisburg
, 249 Ill. App. 3d 822, 619 N.E.2d 1296 (1993).  Therefore, they were properly refused.

Defendants' final contention is that they are entitled to a new trial because the jury's verdicts are irreconcilably inconsistent.  Defendants argue that plaintiff brought one claim for damages based on two different theories.  One theory was that defendants' allocation system breached the dealer agreement, and the other theory was that defendants' allocation system violated the Act.  Defendants state that since the injury claimed was the same–the lost profits from the vehicles plaintiff did not receive–the damages should have been identical, but the jury awarded $2.5 million for the breach-of-contract claim and $2.25 million for the violation of the Act.  Defendants argue that these inconsistent verdicts mandate a new trial, and they cite 
P.A. Bergner & Co. v. Lloyds Jewelers, Inc.
, 112 Ill. 2d 196, 492 N.E.2d 1288 (1986).  
P.A. Bergner & Co.
, however, does not hold that a new trial must
 be granted, only that the trial court did not abuse its discretion when in that case it granted a new trial on damages only.  

Plaintiff responds that the mere fact that the jury returned verdicts for different amounts on the two claims does not mandate a new trial.  Plaintiff cites 
Aldridge v. Fox
, 348 Ill. App. 96, 108 N.E.2d 139 (1952), for the proposition that the proper remedy in such a situation is to allow the plaintiff to collect the larger award, and 
Martin v. Illinois Central Gulf R.R.
, 237 Ill. App. 3d 910, 606 N.E.2d 9 (1991), for the proposition that the court could enter a judgment on the larger award.  In this case, the trial court's order indicated that the judgments for actual damages could be satisfied by defendant's paying $2.25 million–the verdict on the statutory claim and the lower of the two awards.  Under these circumstances, we fail to see how the apparent inconsistency prejudiced defendants, and we conclude that no new trial is warranted on that basis. 

In view of all the foregoing, we affirm the judgment of the trial court.

Affirmed.

HOPKINS and MAAG, JJ., concur.